[S. F. No. 5881.    Department One.—September 18, 1912.]

EDWARD LYNCH, Respondent, v. KEYSTONE CONSOLI-
DATED MINING COMPANY (a Corporation), Appel-
lant.

CONTRACT FOR PAYMENT OF MONEY—PAYMENT TO BE MADE ONLY FROM
MONEY DERIVED FROM SPECIFIED SOURCE.—A party to a contract
may absolutely limit his right to receive a sum of money to be paid
him thereunder to money derived from the other party from a
certain source, and in such a case, where the other party continues
diligently to endeavor to derive such money from the specified
source, he can recover only as it is so derived.

ID.—ACKNOWLEDGMENT OF INDEBTEDNESS—PAYMENT FROM PROCEEDS OF
SALE OF MINE OR FROM NET PROFITS OF WORKING—CONSTRUCTION
OF CONTRACT.—An agreement between a mining company and its
attorney, after reciting certain services of the latter and that it
was entered into in order to satisfy and adjust his compensation
therefor, contained an acknowledgment by the company of an in-
debtedness due to the attorney in a specified sum, a statement of
its intention to sell its mining property, or its capital stock, as
soon as possible, its desire and intent to pay the indebtedness out
of the proceeds of such sale, or otherwise, as provided therein, and
a promise by it to pay the indebtedness out of such proceeds.
The agreement further provided that such sale might not be effect-
ive as soon as anticipated, and in the event it was not made by a
specified date, then payment of the indebtedness should be made
out of the monthly proceeds of the mine, not to exceed ten per
cent of the net profits thereof. *Held,* that the acknowledgment of
the indebtedness cannot be taken by itself, detached from all other
provisions of the agreement, as showing an absolute acknowledg-
ment of so much money due the attorney *in any event,* but should
be construed in connection with the other provisions of the contract,
and that, so construed, it was the intention of the parties that
nothing should be due and payable on account of the indebtedness
until the date specified, in the event that no sale was effected prior
to that time, and that after that date nothing in excess of ten per
cent of the net profits should be due and payable on account
thereof.

ID.—ABSENCE OF DEFAULT OF PROMISSOR—PAYMENT NOT DUE UPON
EXPIRATION OF REASONABLE TIME.—So long as there is no default
or lack of reasonable diligence on the part of the company in the
matter of endeavoring to obtain the fund from which alone the
payment is to be made, the attorney is bound by the terms of the
contract as to the event upon which he is to receive payment there-

under, and cannot maintain an action to recover the indebtedness upon the mere expiration of a reasonable time.

ID.—ACTION TO RECOVER INDEBTEDNESS—INSUFFICIENT FINDINGS TO SUPPORT JUDGMENT.—In an action to recover the whole amount of the acknowledged indebtedness, commenced prior to such a sale being effected, a finding that the company had unreasonably delayed the payment thereof, is held not to be warranted by the evidence, and not to support a judgment for the plaintiff, in the absence of any findings showing that the net profits of the mine had aggregated ten times the amount of such indebtedness, or other facts warranting the judgment in the absence of such net profits.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order refusing a new trial.   Frank J. Murasky, Judge.

The facts are stated in the opinion of the court.

George C. Sargent, Frank H. Gould, and Vincent Surr, for Appellant.

Edward Lynch, Bertin A. Weyl, and Morrison, Dunne & Brobeck, for Respondent.

ANGELLOTTI, J.—This is an action instituted by plaintiff on December 22, 1905, against appellant corporation and M. J. McDonald, to recover $20,300 alleged to be due plaintiff on a written contract. The findings and decision were in favor of plaintiff as against appellant, and in favor of defendant McDonald. Judgment was accordingly given awarding plaintiff as against the corporation the sum of $20,300 with interest, and dismissing the action as to McDonald. On an appeal taken by plaintiff from the judgment of dismissal as to McDonald, such judgment was affirmed, the conclusion being that McDonald never signed or executed such contract in any other capacity than as an officer of appellant corporation. (*Lynch* v. *McDonald,* 155 Cal. 704, [102 Pac. 918].)   This is an appeal by the defendant corporation from the judgment against it and from an order denying its motion for a new trial.

The contract was one bearing date March 1, 1901, and in form was one between appellant corporation and M. J. McDonald, as parties of the first part, and plaintiff, as party of

the second part, but it was signed by McDonald only in his capacity as president of the appellant corporation. It recited that the corporation was the owner of a certain group of mines, that McDonald was the owner of nearly all the capital stock of said corporation, that plaintiff had, since May 26, 1892, rendered the corporation services as attorney in various legal proceedings and also by the discovery and development of very valuable ore deposits in its mines, and had facilitated the operation of its mines by an arrangement and condensation of mining records, maps, surveys, and compilations of surveys and maps and that "it is the intention of the parties hereto to satisfy and adjust the compensation of said Lynch for the performance of said services." It then proceeded as follows:—

"Now, therefore, the parties of the first part for themselves and for and on behalf of said corporation, do hereby acknowledge themselves indebted to said Lynch in the sum of $20,000 over and above the sum of $409.95 advanced to said Lynch on his notes given to said corporation (the payment of which notes and said $409.95 is hereby acknowledged), and whereas, it is not convenient for the parties of the first part to pay said sum of $20,000 at this time, and, whereas, they intend to sell the whole or a large portion of said mining property of said corporation, or of the capital stock thereof, as soon as possible, and they desire and intend to pay said sum to said Lynch out of the proceeds of such sale, or otherwise, as hereinafter provided.

"It is therefore agreed, that out of the proceeds of such sale the parties of the first part shall pay to the party of the second part said sum of $20,000 as in full compensation of the past services of said Lynch as aforesaid;

"Provided, that, whereas, a new mill and shaft equipment of said mine is now being planned and provided for, and whereas, said mine or said stock may not be sold as soon as is now anticipated, and whereas, the relations of the parties hereto are friendly and confidential, and it is the wish and desire of each to aid and assist the other in every way.

"Now, in case said sale is not effected as aforesaid by August 1st, 1902, then provisions shall be made for the payment of said $20,000 to said Lynch out of the monthly proceeds of

the mine, not to exceed ten per cent of the net profits of the mine.''

It was then further provided that, as the parties of the first part desired the future services of Lynch in prosecuting and defending any litigation pending or which might arise, and generally in doing any and all things which he was able to do, Lynch should render all such services for three years at $150 per month until August 1, 1902, said compensation to be then increased if the profits of the mine warranted it ''it being understood and agreed that the amount $150 per month, so to be paid to said Lynch, is measured by the present ability of the parties of the first part to pay rather than by the amount which is earned by said Lynch, and said monthly payment shall be made and accepted in full of said services and in consideration of the desire of the parties of the first part to afford said Lynch an income from said mine in lieu of and instead of interest on said indebtedness, and said payments provided for herein are additional to those provided for by an agreement of even date herewith, made between said McDonald and said Lynch.''   The provision as to the $150 per month was continued in force by later agreements, the last of which was dated September 27, 1904.   On or about April 25, 1901, the contract, executed in duplicate, was signed by plaintiff, and by McDonald as follows: ''Keystone Consolidated Mining Company by M. J. McDonald, president,'' and at McDonald's instance by appellant's secretary as follows: ''By Charles E. Anderson, secretary,'' the latter affixing the corporate seal, and McDonald then delivered to plaintiff one of the duplicate contracts.

Under the terms of this contract, appellant has paid to plaintiff $150 per month for each month from March 1, 1901, to and including May, 1905, but has failed to make any payment for either June or July, 1905, although he performed the stipulated service throughout June and until July 20, 1905, when he was notified that his services were no longer required.   It has paid nothing on account of the twenty thousand dollars, although demand was made for five thousand dollars on July 15, 1905, and demand for the whole twenty thousand dollars on August 8, 1905.

No sale was ever effected of any part of the mining property, nor of any of the capital stock referred to in the con-

tract, and there has never been any transfer of any of said stock except one of 402 shares by McDonald to his wife. There is no finding of net profits of the mine aggregating two hundred thousand dollars, the amount necessary to entitle plaintiff to his full twenty thousand dollars, the only findings that may be claimed to establish net profits being one which it will be assumed shows $41,284.74 net profit from August 1, 1902, to June 30, 1903, and one which it will be assumed shows $18,820.96 net profit from December 1, 1901, to July 31, 1902, and $22,443.62 net profit for the year 1900. The findings as to the amount of net product of the mine are not such as to force any conclusion that there was net profit amounting to two hundred thousand dollars (including that expressly found), or any net profit approximating that amount, or, indeed, any net profit exceeding the aggregate amount of net profits expressly found. There was no allegation or finding to the effect that there had been any lack of diligence on the part of the corporation either in the matter of the proposed sale of the mining property, or in the operation of the mine, the latter having continued almost constantly from the date of the execution of the contract to the time of the commencement of this action. The conclusion of present liability on the part of the corporation for the full amount of twenty thousand dollars named in the contract is apparently based entirely on the finding "that by reason of the premises the defendant corporation, Keystone Consolidated Mining Company, had unreasonably delayed the payment of the amount due and owing under said contract dated March 1, 1901, prior to the 8th day of August, 1905, and prior to the commencement of this action." The only preceding statements in the findings that may be claimed to be pertinent to this are the following. The products of said mines each month have been gold bullion, and gold bearing sulphurets. Ever since April 1, 1903, the monthly product has been shipped to McDonald each month or to banks named by him, and the corporation has been paid each month the money for which said bullion and sulphurets were sold. Ever since April 7, 1903, McDonald, who owned practically all the stock of the defendant corporation, has personally supervised the purchase of every article used in the business, and has personally supervised and been cognizant of the payment of every cent of expendi-

ture, and has usually received duplicate vouchers of every dollar paid out, one being kept at the San Francisco office and one sent to the bookkeeper at the mines. The receipts, bills, payrolls, and vouchers kept in the San Francisco office were destroyed by the fire of April 18, 1906. Prior to April 18, 1906, the accounts of said mines and the net profits of said mines subsequent to April 1900, could be ascertained only from the examination of the original vouchers, bills, receipts, and payrolls aforesaid, consisting of many thousand documents. McDonald stated to plaintiff prior to the commencement of this action that he had not the information whereby to ascertain what profits had been made by the operation of said mines since August 1, 1902, and also, that no profits had been made during such period. It was further found, but such finding is attacked as being insufficiently sustained by evidence, that neither of such statements was true. It was further concluded by the trial court, in a finding attacked by appellant, as follows: The receipts of products realized monthly from the mines were evidenced originally by mint receipts and checks in payment for sales of sulphurets, and the expenditures were evidenced originally by bills, receipts, vouchers, and payrolls, and "in so far as these original transactions were entered in books of account," they were entered in four different sets of books, viz., in two different sets of books kept at defendant's office in San Francisco, one set in the name and for the use of defendant corporation, entries in which appear to have ceased about April, 1900, the other in the name and for the use of McDonald, which appears to have been kept up to the date of the commencement of this action; and in two different sets of books at Amador City, one, of the defendant corporation, entries in which appear to have ceased or to have been neglected for two years prior to the commencement of this action, and the other of the Keystone Supply Company, a company organized by McDonald, and by which he transacted a general merchandise business at Amador City, and bought goods for and sold goods to defendant corporation. The entries in these books appear to have been kept up to the commencement of the action. The two last named sets of books and the vouchers and papers constituting original entries and evidence appear to be in existence.

We are unable to see in these facts any warrant for the con-

clusion that defendant had unreasonably delayed the payment of the amount specified in said contract, if, by a proper construction of its terms, such amount was to be paid by it solely out of the proceeds of the sale of the mining property, or out of the net profits of the mines. No failure by defendant, either willful or negligent, in the matter of the proposed sale or working of the mine by which proceeds or profits might be obtained from which the amount could be paid, being alleged or found, decisions to the effect that where the agreement is to pay only out of the net proceeds of the products of certain land or a certain mine, and the debtor then transfers such land or mine without working the same, and thus voluntarily puts it out of his power to get any product, or retaining it fails and refuses to work the mine, he breaks his contract and is immediately liable for the indebtedness (see *Poirier* v. *Gravel*, 88 Cal. 79, [25 Pac. 962]; *Wolf* v. *Marsh*, 54 Cal. 228; *Love* v. *Mabury*, 59 Cal. 484), are therefore, not at all in point. Nor does it appear from the findings, or, so far as we can see, from the evidence, that the mine is not being worked at some profit, or that from any cause it has become impossible to ascertain whether the monthly net profits of said mine between August 1, 1902, and the commencement of the action amounted to as much as two hundred thousand dollars. Indeed, we are not at all satisfied that the evidence was not of such a nature that it would have sufficiently supported a conclusion by the trial court that such an amount of net profit had, in fact, been obtained. But it is not necessary to determine this, as no such conclusion is contained in the findings. So far as appears from the findings, defendant corporation has acted with due diligence and care in the matter of the working of the mine, has not as yet derived therefrom the amount of two hundred thousand dollars as net profit or any net profit approximating that amount, is still working the mine at a profit, and has done nothing making it impossible to ascertain approximately the amount of net profit thus far obtained, and it is not impossible, as matter of fact, to now ascertain approximately the amount of net profit. We repeat that under such circumstances we can see no warrant for holding that defendant has unreasonably delayed the payment of the full twenty thousand dollars, if it is apparent that it was the intent and purpose of the parties that the

amount should be paid only from the net profits, in the event that there was no sale of the mine prior to August 1, 1902. As said by learned counsel for respondent "it is substantially upon the basis of the interpretation of the provisions of this contract that the conclusions of the court must be reached."

In considering the question of the intent of the parties to the contract, certain facts shown by the evidence may properly be stated. Plaintiff was an attorney at law, and had been rendering services to appellant as attorney and in other capacities, ever since the year 1892, and was well acquainted with the mining property. He had also been rendering services to McDonald, and, as is recited in the contract, the relations of all the parties were "friendly and confidential." He had constantly been receiving pay on account of his services, but claimed that there was justly and fairly due him a large balance for his services, including a large sum as a fair and equitable reward or bonus because of the alleged discovery by him of a valuable ore deposit in the mine, which would increase very materially the value of the mine and the amount of profit that would thereafter be derived therefrom. His claims were entirely unliquidated in nature. His good faith in the matter of representations as to the value of the mine by reason of the existence of these ore deposits, and the probability of great profit therefrom is clearly apparent from the evidence. Shortly before March, 1901, he strongly insisted upon some adjustment of his claims, with the result that, after much consideration by both plaintiff and McDonald, the agreement in suit was executed on March 1, 1901. This agreement was prepared by plaintiff, and was the third draft of a proposed agreement, the others also having been prepared by him. Of the amount of twenty thousand dollars thereby stipulated as due plaintiff, McDonald substantially testified that ten thousand dollars was allowed plaintiff as a sort of reward on account of his alleged discovery of certain ore deposits in the mine, and we do not find that this testimony was in any way denied.

Of course, it cannot be successfully disputed that a party to a contract may absolutely limit his right to receive a sum of money to be paid him thereunder to money derived from the other party from a certain source, as in this case it is claimed it is so limited to ten per cent of the net profits of the mine,

and that in such a case where the other party continues diligently to endeavor to derive such money from the specified source, he can recover only as it is so derived. In other words, the right to the money in such a case is by the contract conditioned on the other party's obtaining it from the specified source. And the question here simply is whether it was so intended to limit plaintiff's right by the agreement before us.

Taking the agreement as a whole, such would appear to be the meaning and intent of its provisions. The acknowledgment of the indebtedness cannot be taken by itself, detached from all other provisions of the agreement, as showing an absolute acknowledgment of so much money due plaintiff *in any event*. It must be read in connection with all the other provisions of the contract, and so read it shows no more than an intention on the part of the parties to settle all alleged claims and equities of plaintiff by an undertaking on the part of defendant to pay plaintiff twenty thousand dollars solely out of the proceeds of a sale of such mining property if a sale was made prior to August 1, 1902, and if no such sale was made, then solely out of the monthly proceeds of the mine, not to exceed ten per cent of the net profits thereof. The agreement on its face clearly shows that it was the intention of the parties that nothing should be due and payable to plaintiff on account of said twenty thousand dollars until August 1, 1902, in the event that no sale was effected prior to that time, and it appears to just as clearly indicate the intent that after that nothing in excess of ten per cent of the net profits should be due and payable on account thereof. The circumstances we have referred to, even if we exclude from consideration the fact that the agreement was drawn by plaintiff, make it manifest that it is the proper construction of what the parties have said in their writing in this regard, if there be any ambiguity in the language used therein, which we do not concede. And it may be added that this appears to have been the practical construction of the agreement by all parties up to July, 1905.

Plaintiff would practically have us substitute for the provisions contained in this agreement as to the payment of the twenty thousand dollars a stipulation that the same shall in any event be payable within a reasonable time, relying on

such statements as the following, to be found in *Noland* v. *Bull,* 24 Or. 479, 485, [33 Pac. 985] : "Where there is a present debt then due, constituting the basis of an agreement which merely postpones the time of its payment to an uncertain future date, when a certain specified transaction shall be accomplished, the agreement is to pay within a reasonable time, whether such transaction is accomplished or not." Similar in principle are such cases as *Busby* v. *Century Gold Mining Co.,* 27 Utah, 231, [75 Pac. 727], and our own case of *Williston* v. *Perkins,* 51 Cal. 554, in which laborers engaged in constructing a schooner were given, for the amounts due them for wages, certificates stating the amount due and that the party named therein was entitled to receive such amount "when the . . . schooner now in course of construction is sold." It was held that the defendants were entitled to only a reasonable time in which to finish and sell the schooner, and that such time having elapsed, the plaintiff could maintain the action. We have no disposition to question the correctness of such decisions, many of which may doubtless be found. The agreement before us was not, as we look at it, of the nature of the kind of agreement referred to by such cases. It was an agreement of settlement of certain alleged claims and equities upon certain terms and conditions, one of which conditions was that the amount agreed upon should be paid only in the event that moneys for such payment should become available from certain specified sources. This being the agreement, as long as there is no default on the part of defendant in the matter of endeavoring to obtain the fund from which alone such payment is to be made, plaintiff is bound by the terms of the contract as to the event upon which he is to receive payment thereunder. The case of *Earle* v. *Sunnyside Land Co.,* 150 Cal. 214, [88 Pac. 920], specially relied on by plaintiff, does not assist him. While the contract there called for payment of a valid indebtedness only from the proceeds of the sale by a land company of certain lots, the land company expressly agreed to use reasonable diligence in placing its lands upon the market and making such sales, and the trial court found that it had failed to use such diligence. It was simply held that while violating this covenant on its part, the company could not stand upon the connected clause providing that no payments

were to be made except out of the sale, and that by reason of the failure to observe this covenant it was liable upon the obligation. As we have indicated in this opinion, even in the absence of an express provision to use reasonable diligence to obtain the money by means of which the payment is to be made, such a provision may be implied, and failure to observe it may result in entitling the other party to recover, independent of the condition, as is shown by cases discussed in the opinion in the case last cited. But, as already shown, we have no showing or finding of any such failure in the case at bar.

It follows from what we have said that the findings do not support the judgment, by reason of their failure to show that there have been net profits of the mine aggregating two hundred thousand dollars, or any sum approximating that amount, or other facts warranting the judgment in the absence of such net profits.

For the purposes of a new trial, it is proper to say that we have considered the other points made by appellant, and are of the opinion that none of them is well based. We can see no reason for doubting that Mr. McDonald was fully authorized to make this agreement for and on behalf of defendant corporation, that the agreement was executed and delivered by the corporation, that it was based upon a valuable consideration, and that its execution was not induced by any fraudulent misrepresentation or concealment. The judgment and order denying a new trial are reversed and the cause is remanded for a new trial.

Shaw, J., and Sloss, J., concurred.

Hearing in Bank denied.

Beatty, C. J., dissented from the order denying a hearing in Bank.