[No. 12770. Department One. — November 6, 1890.]

MICHAEL DWYER, RESPONDENT, v. JOHN CARROLL, APPELLANT.

LANDLORD AND TENANT — REPAIRS — ALTERATIONS — RIGHT OF RE-ENTRY. — A landlord, after the delivery of possession of leased property to his tenant, has the right, and it is his duty, under sections 1929 and 1941 of the Civil Code, in the absence of an agreement to the contrary, to re-enter for the purpose of repairing any dilapidations, not occasioned by the ordinary negligence of the tenant, which render the leased building untenantable, and which occur after the beginning of the term; but a re-entry cannot be made for the purpose of making extensive alterations, as distinguished from mere necessary repairs, unless the right is expressly reserved in the lease.

ID. — UNJUSTIFIABLE. ACTS OF LANDLORD — TRESPASS — CONSENT — REMOVAL OF TENANT. — A right of entry upon leased premises, by the landlord, for one purpose will not justify the performance of acts for another purpose; and the making of extensive alterations during the term without the consent of the tenant constitutes a trespass; nor will the consent of the tenant to an entry for a short time, for necessary repairs, justify extensive alterations requiring the removal of the tenant and the vacation of the premises for a long period.

ID. — DAMAGES FOR TRESPASS BY LANDLORD — PROFITS OF HOTEL BUSINESS — VERDICT NOT EXCESSIVE. — A verdict for five hundred dollars, rendered against a landlord in an action of trespass prosecuted by the tenant,

is not excessive, where it appears that the tenant, who was a hotel-keeper, was, by reason of extensive alterations in the leased premises, deprived of a large portion of his hotel furniture for several months, and that some of it was broken, and the tenant was compelled to vacate the building within three days after the beginning of the month for which the rent had been paid, and at the time of his ejection was carrying on a business in the building that yielded him two hundred dollars net profit per month.

ID. — SPECIAL DAMAGES — LOSS OF BUSINESS — PLEADING. — The loss of the tenant's business is a proximate result of his ejectment from the leased premises, and, as such, is, under a special allegation respecting the same, a proper element of damage.

APPEAL from a judgment of the Superior Court of the city and county of San Francisco, and from an order denying a new trial.

The facts are stated in the opinion.

*Smith & Murasky*, for Appellant.

*T. J. Crowley*, for Respondent.

GIBSON, C. — This appeal is brought by the defendant from a judgment entered upon a verdict for five hundred dollars, rendered against him in an action of trespass prosecuted by plaintiff; also from an order, made therein, denying him a new trial. The plaintiff, in his complaint, alleged that, by virtue of a lease from the defendant, he was the tenant, and, as such, was in the possession of certain premises on Mission Street, in San Francisco, known as the Union Hotel, which he used in carrying on the business of keeping an hotel, from the first day of February, 1886, until the tenth day of November, 1886, when the defendant forcibly and unlawfully invaded the said premises, and ejected the plaintiff therefrom, and tore down and destroyed the building thereon, and removed and destroyed a large portion of the furniture in said building, and withheld the possession of the premises from the plaintiff; that, at the time of such ejection, the plaintiff was earning a net profit of over two hundred dollars per month in his said business of hotel-keeping;

and that, by the trespass of the plaintiff, the defendant's peaceable possession of the premises was destroyed, and his said business ruined, to his damage in the sum of five thousand dollars.

Defendant, in his answer, admitted the relation of landlord and tenant, as alleged by plaintiff, but denied that he committed the trespass, or withheld the possession of the premises, or that the plaintiff was earning two hundred dollars, or any other sum, per month, as a net profit on his business of hotel-keeping, or that he sustained or suffered any damage whatever. It thus appears that the gist of the action is the unauthorized interruption by the landlord of the quiet and peaceable possession of his tenant.

The main question, then, is, Did the tenant suffer such an interruption? It appears, from the evidence, that, early in October, 1886, the tenant, who was holding from month to month, at the monthly rental of sixty dollars, payable in advance, brought to the notice of one Mc-Grath, the agent of the landlord, the fact that the Union Hotel building was in a dilapidated state, particularly the floor of the first story, which had settled several inches in places, and also a back stairway. This, in turn, was communicated to the landlord, who, a few days afterwards, caused the building to be examined, and upon learning that it was in a dangerous state for habitation, the foundation having decayed and given way, he, with the carpenter who made the examination and subsequently undertook the work upon it, went together to the building about the 7th of October, and informed the tenant of the condition of the building, and that it could not be repaired unless it was vacated. The tenant said he did not want to have his occupancy disturbed until after the election, which was to be held on the second day of the following month of November, as he had rented a portion of the first story to the election commissioners for a polling-place. The landlord then said to

the tenant that he would defer the repairs until after the election, but that he (the tenant) would have to occupy the building at his own risk.

These conditions, it seems, the tenant assented to, and he continued to occupy the building until after the election and the canvassing of the votes cast at the polls in the building, which canvassing was not completed until about the 9th of November. In the mean time, that is to say, on the 7th of the same month, the tenant's rent to the 7th of December fell due, and on the 9th of November he paid it. On the 10th of November, the carpenter above mentioned, Mr. Worden, with his men, went to the place and commenced the work upon the building. To this the tenant made no objection, but began to move his effects on the first floor out of the way of the workmen.

Regarding this entry, the evidence on behalf of the tenant tended to show that the latter was informed by his landlord that he, the landlord, only intended to have a new floor put in the first story, and that it would not take more than ten or twelve days to do it, and that the inconvenience resulting therefrom would only be temporary, and would not require the building to be vacated; that, with this understanding, he (the tenant) made no objection, but instead of merely putting in a new floor, the house was raised about fourteen feet, a cellar dug underneath it about nine feet deep, and a new story placed between the cellar and the old building, which changes occupied over two months; that, on account of the house being thus raised, the tenant, with his family, and a number of boarders, were compelled to vacate the building, and he (the tenant) was prevented from obtaining his furniture in the upper story of the building for nearly three months.

In contradiction of this, the evidence of the defendant tended to show that the tenant was fully advised of the unsafe condition of the building, and that a new founda-

tion and floor would have to be put in, which would probably require from thirty to sixty days. As to the necessity of the tenants moving out at the time the alterations of the building were commenced, the landlord testified: "I might have talked to Mrs. Dwyer [wife of his tenant] that it was a dangerous place for her to keep her children. The best thing she could do was to move out. It was before the commencement of the repairs. I did not, after the repairs began, tell her to get out. I would not do such a thing. He kept the furniture upstairs, and intended to have the place when it would be fixed, but he left and rented a place before it was done. That was in February, 1887, I guess. I was not notified that he intended to move. I saw him moving his furniture. I asked him, was he going to move, and he said: 'Yes; I have rented that place at the opposite side.' That is the only time, after the repairs were begun, I had a conversation with him. One time he asked me what the rent would be. I told him I could not tell him what the rent would be, for I did n't know what the building was going to cost. This conversation took place some time during the improvement on the building."

This makes it apparent that the plaintiff, on his part, endeavored to show that he consented to the entry of his landlord during the month of November, for which he had paid rent, for the purpose of repairing the floor in the first story, with the understanding, however, that he (the tenant) would not have to vacate the building, and, at most, would not be inconvenienced in his possession more than twelve days, and not otherwise; and that the defendant, in like manner, tried to prove that his tenant understood that the foundation of the house would have to be repaired as well as the floor, and so understanding it, he assented to the entry for such purposes, and on finding that the building could not be safely occupied while the repairs were being made, he (the tenant) vol-

untarily vacated it, and yielded up the possession of the premises. It is well established that if one consents to an act, he is not injured by it, but, in order to constitute a consent, the minds of the parties must meet upon the same thing in the same sense.

Now, if, in this case, the plaintiff's position be the true one, it is evident that the minds of the parties did not meet in the above sense. The evidence shows that, instead of the landlord's entering to repair the building,— that is, to restore such portions of it as were decayed or worn out;— he entered for the purpose of making extensive alterations in the building, that is, to make a different building of it; and that, during the progress of the alterations, the building became uninhabitable, in consequence of which the tenant was compelled to vacate it. It does not seem probable that the tenant paid rent for a month in advance, a few days before the work was commenced, knowing that in a few days thereafter the house would be raised about fourteen feet and an excavation of nine feet made under it, so as to cut off all communication with the upper story, and thereby render his use and enjoyment of the building impracticable, if not impossible.

There is in fact nothing in the evidence tending to show that anything was said, or intimation given, to the tenant regarding the putting in of a new story or the digging of a cellar. Nor is there anything tending to show that the tenant contemplated such changes being made. And as the jury, who were the exclusive judges of the value and effect of the evidence, which, as is above shown, was conflicting regarding the consent of the tenant to the entry, found a verdict for a sum certain in favor of the plaintiff, they, in effect, found for him upon all the issues. (*Mendelsohn* v. *Lighter Co.*, 40 Cal. 657.) We must therefore hold, in accordance with their verdict, that the tenant did not consent to the re-entry made by the landlord. This being so, the first contention of

the appellant, that the tenant assented to the landlord's re-entry, cannot be sustained.

The appellant, however, further contends that, even if the tenant did not consent to the re-entry, the landlord had the right to re-enter upon the premises for the purpose of making all necessary repairs, by virtue of section 1941 of the Civil Code, which reads as follows: " The lessor of a building intended for the occupation of human beings must, in the absence of an agreement to the contrary, put it into a condition fit for such occupation, and repair all subsequent dilapidations thereof, which render it untenantable, except such as are mentioned in section 1929." And the section referred to as the exception declares: " The hirer of a thing must repair all deteriorations or injuries thereto occasioned by his ordinary negligence.

Under those sections, it is clear that, in the absence of an agreement to the contrary, the landlord, after the delivery of possession to his tenant, has the right, and it is made his duty, to re-enter for the purpose of repairing any dilapidations not occasioned by the ordinary negligence of the tenant which render the leased building untenantable and which occur after the beginning of the term. But while this is so, the facts of this case do not come within the rule so established, because, as we have already seen, the re-entry was made, not for the purpose of making necessary repairs, but, on the contrary, to make extensive alterations. A re-entry cannot be made for such a purpose unless the right is expressly reserved in the lease. (Civ. Code, sec. 1927.) And a right of entry for one purpose will not justify the performance of acts for another purpose. ( *Shiffer* v. *Broadhead*, 126 Pa. St. 260.) In that case, the defendants had the right to enter upon certain woodland to cut trees of a certain size, but they were held liable in trespass for cutting trees of a different size. So in the present case, the landlord had a right, as already shown, to re-enter

to make necessary repairs, but having made unauthorized alterations, instead of repairs, he thereby committed a trespass. Therefore this second contention of appellant must also be resolved against him.

The remaining point urged by the appellant is, that the damages found are excessive. ˙ The evidence shows that the tenant was deprived of a large portion of his furniture for several months, and that some of it was broken, but there is no estimate as to what loss such deprivation and breakage caused. But it is undisputed that the landlord accepted rent from the tenant, and the jury impliedly found that, on account of the unauthorized alterations begun by the landlord, the tenant was compelled to vacate the building within three days after the beginning of the month, for which the rent had been paid; and at the time of his ejection the tenant was carrying on a business in the building that yielded him two hundred dollars net profit per month. This is not contradicted. It is true, however, that it appears the tenant moved across the same street and there continued in the same business, but whether at a profit or a loss is not shown. In view of this state of the evidence, we cannot say that the damages are excessive.

Appellant suggests that the loss of plaintiff's business, which he pleaded specially, is not a proper element of damages. But we think the destruction of his business was a proximate result of his ejectment from the leased premises, and, as such, was, under his special allegation respecting the same, properly considered in estimating the damages sustained. The case of *Dexter* v. *Manley*, 4 Cush. 14, sustains this view. There, as here, the lessee was deprived of the use of the property leased, and it was held that the rule of damages was the value of the lease, and that the amount of business and profits, which were also specially pleaded, in connection with the rent reserved, were competent to show such value. The same principle is recognized in *Lambert* v. *Haskell*, 80 Cal. 611.

We therefore advise that the judgment and order be affirmed.

HAYNE, C., and FOOTE, C., concurred.

The COURT. — For the reasons given in the foregoing opinion, the judgment and order are affirmed.

Hearing in Bank denied.