[Civ. No. 3259. Third Appellate District.—June 18, 1927.]

J. K. MILLS, Respondent, v. A. A. RICHARDS, Appellant.

Cook & Nichols for Appellant.

A. J. Carlson for Respondent.

FINCH, P. J.—The defendant is the lessee of a three-story brick building in the town of Turlock, the owner and lessor thereof being D. H. Arakelian. At the times mentioned herein the ground floor was occupied by stores and a theater, the ceiling of the theater being higher than those of the other rooms. The second and third stories above the

stores, containing two apartments and nineteen other rooms, were used as a hotel, which was known as the Broadway Hotel. The defendant sublet the hotel, fully furnished, for a term of five years from the first day of July, 1920. The sublessee deposited $1,000 with the defendant as security for the payment of installments of rent as they became due. Through various assignments, the plaintiff acquired the rights of the sublessee, including the latter's interest in the deposit of $1,000, and went into possession of the hotel in January, 1923. On May 2, 1923, the plaintiff was informed by defendant and Arakelian that the building was unsafe for human habitation and he and his guests immediately vacated the premises. On the following day he served the defendant with written notice of such removal and demanded payment of the amount of the deposit, less the sum of $320 due for rent at the time of removal. Upon defendant's refusal to make such payment this action was commenced. In addition to denials of allegations of the complaint, the defendant filed a cross-complaint for rent alleged to be due for the months of April, May, June and July, 1923. Judgment was entered in favor of the plaintiff for $680, the amount demanded by him; and the defendant has appealed. In appellant's opening brief it is said: "The question involved on this appeal is whether or not the plaintiff . . . was evicted from certain premises known as the Broadway Hotel." In determining this question it will be sufficient to state the evidence which supports the findings and judgment, this court being bound by the findings of the trial court upon substantially conflicting evidence.

The plaintiff testified that about the 1st of May, 1923, Arakelian informed him and other tenants "that the building was unsafe and it would be necessary to make repairs and if we stayed in there we were staying . . . at our own risk"; that "immediately after that we received that notice from the city engineer . . . that the building was in an unsafe condition"; that he immediately moved out; that on May 9th he delivered the keys of the building to the defendant and stated that he "would not be responsible for it any longer"; that the defendant said, "All right"; that "he took the keys all right and . . . he said I could leave the keys . . . and he would take care of them";

that the unsafe condition of the building "was the talk of the street generally" after May 2d. Mrs. Mills testified that "there were articles in the paper after we went out, concerning the condition of the building"; that "we had permanent guests in the house when the building was condemned and we had to refund their money"; and that "it would require a large effort . . . to build up the patronage of the hotel again as to permanent guests or either as to transient guests." Defendant's agent for the collection of rents testified that, in the presence of the defendant, he notified the tenants, including the plaintiff, "that I thought the building was in a dangerous condition and they might remain there or they might move out, and if they stayed in there, they stayed at their own risk." The testimony of this witness stands uncontradicted. The city engineer testified that he told the plaintiff "to get out of there and get out of there quick for I thought the building was liable to collapse"; that he inspected the building about May 1, 1923, and "I found that the roof was held up by six trusses, each approximately a 62-foot span, six and a half feet rise. The members of these trusses were built up of ⅞-inch boards. The lower chord of one truss had parted to the extent of four inches; the upper chord had sunk possibly six or eight inches and the ceiling attached to the lower chord had sunk several inches. The walls settled. The 12-inch brick wall had been kicked out of place by the expansion of the lower member of the truss"; that he later made a more thorough examination and "found that, while only one truss had broken, they were all built in a very defective manner . . . and were liable to go at any time"; that if the roof collapsed "this would undoubtedly bring down the walls on the whole building"; that the repairs of the building were completed "about the 1st of August, possibly a little before that"; that "the work dragged on a great deal longer than there was any occasion for it to have done"; that the hotel could have been occupied safely after the middle of July; that at that time "the hallways were full of dirt, lime and plaster and all that sort of thing, but there was no reason why that could not have been cleaned out and the hotel building used." Several other competent witnesses gave testimony to the same effect. One of them testified that he found the roof

in a "very poor condition. . . . One truss was broken and the next truss was sagging and part of the ceiling was going down, and I didn't inspect it much more because I was afraid. I pulled out of there as fast as I could." The contractor who repaired the building testified that the repairs were completed July 26th, but that the building was safe for occupancy about two weeks earlier. A witness for defendant, who prepared the plans for repairing the building, testified that he was engaged in preparing such plans before the broken truss was discovered; that "the design of the trusses of the building was not safe and not proper, and Mr. Arakelian had been told or had noticed himself that, I think immediately after the building. Had some trouble with it. I wasn't connected with that. . . . It was a very poor job."

It clearly appears from the uncontradicted evidence that, by reason of faulty construction, the building never was safe or fit for the occupation of human beings, and that the defendant's notice to the plaintiff to vacate the building or to remain at his own risk, as well as the similar notice given by Arakelian, was not for the purpose of enabling the owner to make ordinary repairs of dilapidations occurring subsequent to the execution of the lease or the sublease, but for the purpose of reconstructing the roof trusses, owing to original defects therein which rendered the building unsafe. The effect of the re-entry for that purpose was to oust plaintiff entirely from possession of the property leased to him for a period of at least ten weeks, which the testimony shows and the court found "was an unreasonable time," and it resulted in the destruction of the plaintiff's business. In *McDowell* v. *Hyman,* 117 Cal. 67, 69 [48 Pac. 984], the plaintiff was conducting a lodging-house in a part of a building leased from defendants. The defendants "conducted certain alterations and improvements on the second floor by tearing out partitions and walls, putting in new partitions, plastering, removing the front doors, etc., whereby plaintiff was damaged, and her quiet enjoyment of the premises as a tenant was interfered with." The court said: "The principal covenant on the part of a landlord, which, if not expressed, is implied, is that his tenant shall have *the quiet enjoyment and possession of the premises* during the continuance of the term.

'This covenant, whether expressed or implied, means *that the tenant shall not be evicted* or disturbed by the lessor or by persons deriving title from him, or by virtue of a title paramount to his.' (1 Taylor on Landlord and Tenant, sec. 305.)'' ''The general rule . . . relating to a constructive eviction is that any disturbance of the tenant's possession by the landlord whereby the premises are rendered unfit or unsuitable for occupancy in whole or in substantial part for the purposes for which they were leased amounts to a constructive eviction, if the tenant so elects and surrenders his possession.'' (*Veysey* v. *Moriyama,* 184 Cal. 802, 805 [20 A. L. R. 1363, 195 Pac. 662]; *Agar* v. *Winslow,* 123 Cal. 587, 593 [69 Am. St. Rep. 84, 56 Pac. 422]; *Coen* v. *City of Los Angeles,* 70 Cal. App. 752, 765 [234 Pac. 426]; *Kelley* v. *Long,* 18 Cal. App. 159, 163 [122 Pac. 832]; *Agoure* v. *Lewis,* 15 Cal. App. 71, 76 [113 Pac. 882].) Appellant says: ''The lack of safety might have been cured within two or three weeks, and no doubt was.'' The evidence shows that the building was not fit for occupancy prior to the middle of July. █ If, however, the building could have been made or was made safe for occupation within two or three weeks after plaintiff vacated the premises, then it was the duty of the defendant immediately to restore to the plaintiff the quiet possession thereof, without further delay for unnecessary repairs. (*Dwyer* v. *Carroll,* 86 Cal. 298, 304 [24 Pac. 1015].)

The judgment is affirmed.

Thompson, J., *pro tem.,* and Plummer, J., concurred.