[Civ. No. 37469. Second Dist., Div. Two. Dec. 17, 1971.]

EDWIN CLARK et al., Plaintiffs and Respondents, v.
BERNARD SPIEGEL et al., Defendants and Appellants.

**COUNSEL**

Ball, Hunt, Hart, Brown & Baerwitz, Joseph A. Ball, Joseph D. Mullender, Jr., Phillip K. Fife, Douglas Dalton and Laurence F. Jay for Defendants and Appellants.

Levin, Oliker & Ballin, Harmon R. Ballin, Albert & Albert and Carl A. Albert for Plaintiffs and Respondents.

**OPINION**

**ROTH, P. J.**—This is an appeal from a judgment predicated upon a jury verdict of $65,000 awarded as damages to plaintiffs-respondents, Edwin and Irene Clark (Clark) suffered as a consequence of their constructive eviction from leased premises by lessor, appellants who were the owners of the Granada Hills Plaza, a shopping center complex in the San Fernando Valley.

On November 30, 1961, Clark signed a 10-year lease for premises located in the Granada Hills Plaza in which he intended, and did, establish a coin-operated laundry. The leased premises were at the time of the execution of the lease a part of land upon which the lessors were developing a market complex. Grant's Department Store, then under construction, occupied a prominent part of the same land and faced onto a proposed mall. Clark's premises, selected by agreement from plans reflecting the market complex to be developed, fronted upon the mall directly opposite Grant's Department Store and occupied a corner location contiguous to a rear parking lot area. The lease required appellants to keep the parking lot properly lighted.

The record shows without dispute that the presence of Grant's Department Store across the mall from the Clark premises was by appellants[1] held out to be and was relied upon by Clark in consideration for the execution of the lease.[2]

---

[1] In correspondence between Grant's and appellants relating to the mall entrance, the latter acknowledged that they had ". . . represented to all of the tenants that the interplay between their stores and your store through these side doors would help their business too."

[2] The mall entrance to Grant's which was in course of construction at the time Clark executed his lease, and was already visible.

After the construction of the market complex had been completed, Grant's had difficulty with the traffic which flowed in and out of the doors which fronted the mall. Clark testified that his customers used these doors "extensively." According to the manager of Grant's, however, 90 percent of "what little" traffic came through these entrances consisted of shoplifters, mainly youngsters who came around after school closed. Whatever the reason—Grant's began to first lock the mall doors intermittently in March or April of 1963 and then decided to bar this entrance permanently. Grant's sought appellants' permission for the permanent closing of the mall entrance and did not wall up the mall doors until appellants' consent in writing was obtained. Protest was made by Clark to appellants without avail during the time Grant's locked its doors and during the time Grant's was seeking permission to wall up the doors that exited on the mall.

The maintenance of the mall in the manner set forth in the plans and the fact that Grant's would maintain an entrance and exit on the mall were not in the lease. However, appellants admitted that both facets of the mall setup were used as inducements to persuade tenants to sign. Thus appellant Abrams, one of the lessors and a lawyer, said in pertinent part in a letter to Grant's: "I have spoken separately to several of the tenants in the mall area and now have their oral consent. I went to this trouble because when leasing to these tenants, we used as an inducement, the fact that there would be access from the Grant store to the mall, and thus to the stores which these tenants would occupy. *I don't want the tenants to claim that we were in violation of our leases with them by closing your doors. I am worried about this aspect.*"[3] (Italics added.)

Beginning in 1963, difficulty developed in respect of light maintenance on the rear parking lot contiguous to the Clark premises. The lease between the parties contained an express provision that proper lights were to be continuously maintained by appellants. Replacements of light fixtures and bulbs destroyed by vandals were made in 1964 but less so in 1965. Finally, repair work for light maintenance and replacement of broken or functionally exhausted lights was less and less up to standard. Commencing with early 1966, the lot was entirely dark.

Clark made continuing efforts to persuade appellants to remedy the lighting situation and as pointed out, he had vigorously protested the closing of the mall entrance. Clark's complaints in both respects proved

---

[3]Appellants were worried about more than just the tenants. The same letter added the following pertinent information: " . . . I do feel that we should obtain the consent of the lending institution of the store property to the west of the mall area because we made the point in our presentation to them, before the loan was made, that the stores would be desirable stores because there would be access from the Grant store to the mall. I am hopeful that we will obtain this consent in writing."

unavailing. The present action was instituted in November 1966 and the premises vacated in February 1967.[4]

Appellants concede that "The landlord's duty to maintain the parking lot lights is an obligation of the lease." Moreover, they implicitly admit in the factual recital above, that Clark's complaints about their failure to maintain the lights were and are well-founded.[5] Finally, they take no issue with the evidence presented by Clark at trial which tended to show that a dark parking lot had an adverse effect on Clark's business. Since an estimated 40 percent of the laundromat's business came at night, testimony to the effect that the lack of adequate lighting would impede "customer relations" and be injurious to business was of obviously persuasive and probative value in determining that Clark's use and enjoyment of the leased premises was substantially affected by appellants' failure to maintain the parking lot lights. Continued breach of continuing covenant clearly constituted an eviction.

Appellants' attempt to avoid the necessary result of the concession made in respect of maintenance of lights on the parking lot by concentrating their fire on the controversy relative to the doors of Grant's Department Store which fronted on the mall and which were first closed in 1963. They contend variously it was conceded that there was no "contemporaneous oral agreement" relating to the mall doors; that the lease was unambiguous and not susceptible to the interpretation that they had a duty to require Grant's to keep its mall doors open (*Owsley* v. *Hamner,* 36 Cal.2d 710 [227 P.2d 263, 24 A.L.R.2d 112]) and that, in any event, Clark waived any breach because he did not vacate the premises within a reasonable time.

Although Clark did not claim a "contemporaneous oral agreement" as appellants assert, it should be noted that the statement of Clark's counsel, apparently relied upon by appellants, is as follows: "We're not here contending that there was an oral contract to leave open those doors. What we're saying is that as part of the written lease the doors fit in, that the extrinsic evidence both oral and written that the plaintiff [Clark] seeks to introduce shows that those doors and those passageways *were part of the written lease,* it's not a *separate* oral contract." (Italics added.) Clark's

---

[4]Appellants' counterclaim for rent due under the lease was disallowed by the jury.

[5]With respect to the rear parking lot lighting, there was conflicting evidence as to when and to what extent the lighting in this lot was impaired. Clark testified that the rear lighting did not become critical until the fall of 1964 after the time change. He added that the landlords were "keeping up" the lights through the end of 1964, and that it was not until 1965 that there appeared to be a cessation of maintenance. There was no dispute, however, as to the cause of the problem. The lights which became nonoperative in the rear lot failed not from wear, but rather from acts of vandalism. Of course, there is nothing in the lease which excuses appellants from repairing the lights when damage or disrepair was caused by acts of third parties.

counsel thus reiterates what one of appellants conceded in a letter saying "I don't want tenants claiming we were in violation of our leases . . ." (*supra*). ■ A separate oral agreement is indeed, as appellants contend, subject to defenses which are not applicable to an unintegrated written agreement, part of which is not reduced to writing but is provable by parol evidence. ■ The issue posed therefore is whether the parol evidence in respect of the representation by appellants that the mall doors would be there and that there would be a continuing maintenance of the mall doors was a part of the unintegrated written agreement. (See fn. 3 and its text, *supra*.) (*Masterson* v. *Sine*, 68 Cal.2d 222, 225 [65 Cal.Rptr. 545, 436 P.2d 561]; *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.*, 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Delta Dynamics, Inc.* v. *Arioto*, 69 Cal.2d 525 [72 Cal.Rptr. 785, 446 P.2d 785].) The admissibility of the evidence was thoroughly argued before the actual trial. It was properly admitted in our opinion, and the foregoing cases hold it was integrated with and became a part of the written agreement. It is clear from the pleadings, the pre-trial and the trial proceedings that Clark predicated his claim for damages upon his right to the quiet enjoyment of both covenants.

The evidence was abundant and substantial in the proof that the closing of the mall doors and/or the neglect of the lights in the parking lot caused a loss of customers to Clark as a consequence of which he suffered substantial damage.

■ Accepting the premise that the agreement at bench was an unintegrated lease, Clark remained on the premises almost four years after the first closing of the doors and for approximately three years after the mall doors had been *permanently* locked before he vacated the premises. Yet, Clark's case hinged and the testimony of his experts was predicated as much on the closing of the mall doors as on the failure of the appellants to maintain the parking lot lights.

■ However, there is a clear obligation incumbent upon a lessee alleging an interference with the implied covenant of quiet enjoyment to vacate the premises within a reasonable time. (*Mills* v. *Richards*, 84 Cal.App. 52, 57 [257 P. 542]; *Sanders* v. *Allen*, 83 Cal.App.2d 362, 366 [188 P.2d 760].) Four or even three years cannot remotely be considered "reasonable." It thus appears that during that four-year period of time Clark gambled that his business would prosper. ■ He cannot now place appellants in the position of insurers of that gamble by the simple expedient of suing upon the breach of the covenant of quiet enjoyment, and ignoring his failure to vacate the premises within a reasonable time after he (Clark) alleges that that covenant was breached, to wit, 1963-1964.

■ Eviction is a breach of the covenant of quiet enjoyment. ■ There can be no eviction, actual or constructive, if the lessee continues in the possession of the premises. (*Slater* v. *Conti,* 171 Cal.App.2d 582, 586 [341 P.2d 395].)[6]

■ Accordingly, it was error to instruct the jury in substance that interference with the mall doors could amount to a constructive eviction.

■ Since Clark's constructive eviction did not come about until 1967, it follows that the entire evidence presented on the issue of damages was based on the false factual premise that the damage period commenced three years earlier than it did. In view of the obvious complexities inherent in the assessment of damages arising from lost profits, especially of a relatively new business, that matter should be determined after the presentation of evidence.

The judgment is reversed in part and remanded for a new trial on the issue of damages.

In all other respects, the judgment is affirmed. Each party to bear their own costs.

Fleming, J., concurred.

**COMPTON, J.,** Concurring and Dissenting.—I concur in the reversal of the judgment on the issue of damages. However, I would reverse the entire judgment.

The majority conclude that it was error to instruct the jury that interference with the mall doors could amount to a constructive eviction. With this I agree.

On the other hand the majority concludes that evidence was properly admitted concerning the landlord's duty to keep open the mall doors. With this I disagree. Neither *Masterson* v. *Sine,* 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561], nor *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373], has changed the rule prohibiting extrinsic evidence from *adding to* or detracting from the terms of a contract that has been reduced to writing. (*Weisenburg* v. *Thomas,* 9 Cal.App.3d 961 [89 Cal.Rptr. 113].)

---

[6]We note the reference to 41 A.L.R.2d 1414, 1418, wherein it is noted that there is "support" for the view that where the tenant is seeking damages for the breach of the covenant, an eviction is not required. The same citation, of course, goes on to note the extensive list of authorities which do not "support" this principle (pp. 1423-1425), which has not established itself in our state, and which is questionable under the specific facts at bench, in light of an injured party's fundamental duty to minimize its damages.

The parol evidence offered in this case had the effect of *adding* a specific covenant to the lease which was not contained in the written instrument, to wit, that the landlord would undertake to keep the mall doors open. Furthermore, there was no evidence that the landlord had authority to prevent Grant's from closing its doors or that the landlord's permission was required for such closing. Therefore, there was no act by the landlord which could amount to constructive eviction.

In any event, whether instructing the jury concerning the interference with the mall doors was error for the reasons stated by the majority or for the reason I have stated, it is impossible at this juncture to determine what effect such instructions had on the jury's verdict as to the issue of liability. Since the majority agrees that it was error to instruct the jury that the closing of the mall doors could constitute a constructive eviction, that error goes not only to the issue of damages but also as to the issue of liability. Such a significant error in the jury instructions could hardly be described as harmless or inconsequential.

The case as to liability should be retried on the issue of whether the failure to keep the parking lot lighted, alone, constituted a constructive eviction.

A petition for a rehearing was denied January 11, 1972, and respondents' petition for a hearing by the Supreme Court was denied March 8, 1972. Peters, J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.