[L. A. No. 21549. In Bank. Dec. 15, 1950.]

NATHAN NEWBY, JR., Respondent, v. WILLIAM O. ANDERSON et al., Appellants.

Pat A. McCormick, Morrow & Trippet, Hubert T. Morrow and John C. Morrow for Appellants.

Newby, Holder & Newby and Nathan Newby for Respondent.

SPENCE, J.—Plaintiff brought this action to recover damages for the alleged breach of a royalty agreement. Upon a trial by the court, findings were made and judgment was entered in plaintiff's favor for $13,753.40. Defendants have appealed, urging, as ground for reversal, that the evidence does not support the findings and the judgment, and that the court erroneously interpreted the parties' agreement. The record sustains defendants' position.

There is no dispute as to the essential facts. Prima Products, Inc., was the exclusive distributor in the United States of a masonry waterproofing product known as "Aquella." By an agreement dated December 28, 1945, it granted to plaintiff exclusive distribution rights of this product in the western states. On the same day plaintiff entered into an agreement with Allan Greenwood Company whereby the latter undertook distribution of the product and performance of plaintiff's contract with Prima Products, and agreed to pay plaintiff a royalty of five cents per gallon on Aquella sold. Soon thereafter Prima Products raised certain objections to the methods employed by the Greenwood Company, and in order to settle the dispute it was decided that some new arrangement should be made whereby the latter would be eliminated from the distribution process. To effectuate this purpose, defendants—partners doing business as Anderson Sales Organization—entered into the negotiations and arranged in April, 1946, for the payment of $32,500 to the Greenwood Company for the franchise it held and its unfilled orders in the designated area. In culmination of the negotiations, these papers were executed on April 22, 1946: (1) a "distribution" agreement made directly between Prima Products and defendants; and (2) a "royalty" agreement, approved by Prima Products, whereby defendants undertook to pay plaintiff a royalty on the amount of Aquella they sold.

Under the terms of the royalty agreement, defendants undertook to do nothing which would jeopardize their rights under the agreement with Prima Products, the master contract. Plaintiff in his complaint charged that defendants breached the royalty agreement by wilfully defaulting under the agreement with Prima Products. Since the matters argued by the parties concern primarily the proper construction of these two related agreements, it is necessary to recite their essential provisions in some detail.

*First*—the "agreement creating territorial distributor's rights" as made between Prima Products and defendants:

"It is agreed that 'The Andersons' shall be the exclusive distributor of AQUELLA in the [western] states and that no sale in the said states shall be made except through 'The Andersons,' their agents, distributors, salesmen and purchasers.

"It is understood by both parties to this agreement that in order to adequately serve the needs of the . . . western states at the present time, a minimum quota of 400,000 gallons is essential. In order to permit 'Prima' to plan the orderly production of merchandise needed to fulfill this quota, it is understood and agreed that *in order to retain exclusive distribution* 'The Andersons' must purchase 400,000 gallons of AQUELLA per annum in quarterly quotas of 100,000 gallons . . . The above minimum yearly quota of 400,000 gallons is based on a percentage of overall sales in the United States, namely twenty (20%) percent of a national sales volume of two million gallons . . . In the event that the overall national sales volume declines, then the minimum requirements of 400,000 gallons shall be reduced in like proportion . . . (Emphasis added.)

"If 'The Andersons' fail to order the minimum quota of AQUELLA as herein required, 'Prima' shall have the option to sell AQUELLA direct to purchasers located in said exclusive territory of 'The Andersons,' until said minimum quota requirement shall have been met, but it shall not be obligated to do so. In the event there is a default by 'The Andersons' to sell said minimum quota of AQUELLA as herein required, and 'Prima' does not exercise its option to sell direct to purchasers in said exclusive territory of 'The Andersons,' then and in that event, but not otherwise, 'Prima' may cancel this agreement upon giving to 'The Andersons' a written notice of cancellation specifying the alleged default, and 'The Andersons' shall have the ensuing seventy (70) days within which to correct said default . . .

"It is agreed that 'The Andersons' shall diligently . . . prosecute the sale of AQUELLA throughout the entire territory, and do all things reasonably necessary to establish the sale of AQUELLA in all trade centers and through all proper channels of trade.

"The term of this agreement shall be from April 12th, 1946, to April 12th, 1969, and provided that should 'The Andersons' be not then in default, it shall be renewable upon the same terms and conditions for an additional fifteen (15) years. . . ."

On October 16, 1946, Prima Products sent defendants a

notice of cancellation of the "distribution" agreement because defendants "failed to meet the sales quota set up" for the first six months, and on December 24, 1946, upon the expiration of the seventy days allowed for the cure of the default, Prima Products notified defendants that their "contract [was] terminated."

*Second*—the "royalty" agreement as made between plaintiff and defendants:

After reciting that plaintiff was "the owner of the exclusive right to sell and distribute . . . Aquella in the . . . western states" (pursuant to an agreement theretofore made with Prima Products); that he was "willing to cancel [his] agreement" theretofore executed "with Prima Products" and "to permit" defendants "to enter into a [distribution] agreement direct with Prima Products"; that it was "the intention of the parties" that plaintiff "should be paid a royalty . . . in consideration of the cancellation of [his] said agreement . . . with Prima Products," it was provided: (1) that plaintiff "agree[d] to the cancellation" and "the execution of a new agreement . . . between [defendants] and Prima Products," a "copy of which agreement ha[d] been submitted to . . . and approved by" plaintiff; (2) that "in consideration of said cancellation and execution of the new agreement," defendants "agree[d] to pay [the stipulated] royalty" to plaintiff "on the tenth of the month following the month in which said merchandise [was] sold"; (3) that the "obligation to pay royalties" should "last and continue as long as the term of [the] agreement between Prima Products" and defendants, "or until April 12th, 1969, and for an additional fifteen years" if defendants were "not in default with Prima Products"; and (4) defendants "agree[d] not to do anything which [would] jeopardize rights of [defendants] under said agreement to be entered into with Prima Products."

Although plaintiff's complaint alleged that defendants had wilfully defaulted under the distribution agreement, plaintiff's counsel unequivocally took the position at the trial that such matter was an immaterial issue as defendants "were under the imperative obligation of keeping the Prima Products contract in good standing by the purchase of at least the minimum amount required." Plaintiff's counsel took the same position with respect to defendants' claim that they had used reasonable diligence in prosecuting the sales campaign. Accordingly, plaintiff's objection to defendants' offer to prove their diligent efforts in good faith to sell Aquella in their terri-

tory was sustained, with the trial court observing that since plaintiff was "going to rely upon the sole point that [the contract] was breached by reason of the fact [defendants] didn't take the quotas, then this field of inquiry as to why [defendants] didn't sell more of the product [became] absolutely immaterial."

Also upon the trial, the court admitted considerable evidence as to the circumstances leading up to and surrounding the execution of the agreements, but it sustained objections to defendants' offers to prove the discussions between the parties immediately prior to the signing of the royalty agreement. Such extrinsic evidence as was admitted had no tendency to throw light upon the vital issue in the trial, that is, the question of the duties owed by defendants to plaintiff under the agreements. On the other hand, the rejected evidence was highly material upon that issue. However, in our view of the record, it appears unnecessary to determine whether the extrinsic evidence offered by plaintiff was properly admitted or whether the extrinsic evidence offered by defendants was properly excluded, for a consideration of the two agreements involved, either with or without regard to the extrinsic evidence which plaintiff introduced, impels the conclusion that plaintiff's interpretation, which was adopted by the trial court, cannot be sustained.

Upon the theory that pursuant to the agreements, defendants were under an absolute duty to purchase the minimum quota specified in the distribution agreement, the trial court found that defendants had "wilfully defaulted" by their failure to purchase that quota. There was no evidence, other than such mere failure, to show wilfulness or lack of reasonable diligence. Consistent with the view that evidence of defendants' reasonable diligence was immaterial, the trial court received no evidence and made no finding on that issue. The trial court awarded damages to plaintiff in the sum of $13,753.40, based upon royalties in the amount of five cents per gallon on the full minimum quota for the first year of 400,000 gallons, or $20,000, less a credit in defendants' favor for the sum of $6,246.60, which they had paid plaintiff on the 124,932 gallons sold by defendants prior to the cancellation of the Prima contract. Defendants challenge the propriety of the findings and judgment as unsupported by the evidence, and as resting upon an erroneous interpretation of the parties' agreement. Accordingly, it is necessary to analyze the two related agreements upon which plaintiff's claims are

based in order to determine the rights and duties of the parties.

Looking first at the agreement between Prima Products and defendants, the master contract: At the outset there was the recital that "The Andersons" were "desirous of undertaking a right for the exclusive sale and distribution of AQUELLA" in the western states, and it was agreed that they should be "the exclusive distributor" in the designated territory, subject to certain limitations not here relevant. It was then "understood" that a "minimum quota of 400,000 gallons" was "essential" for the adequate service of the named territory, and it was agreed that "in order to retain exclusive distribution" defendants "must purchase 400,000 gallons . . . in quarterly quotas of 100,000 gallons," but this "yearly quota," representing 20 per cent of the total sales in the United States, should be reduced proportionately in the event the "overall national sales" declined. There then followed two specified consequences of a failure by defendants to "order the minimum quota": (1) Prima Products might sell direct to purchasers in defendants' "exclusive territory" or (2) Prima Products might elect to "cancel" the agreement by giving written notice of default, with defendants then having 70 days in which to cure the default. It is thus apparent that defendants did not undertake absolutely and in all events to purchase the specified minimum quota of Aquella, but only agreed that upon their failure to do so, the agreement for their right of "exclusive distribution" was subject to cancellation, at the option of Prima Products. Defendants did undertake, however, to "diligently prosecute" the sale of Aquella in their territory and "to do all things reasonably necessary to establish the sale of AQUELLA in all trade centers and through all proper channels of trade." But so long as they were reasonably diligent in their efforts to make sales, defendants were subject to no penalty for failure to purchase the minimum quota except as above mentioned.

Turning now to the royalty agreement: At the outset there is the recital that it was the "intention of the parties" that as long as Aquella was sold through defendants, plaintiff should be paid a royalty, in consideration of plaintiff's cancellation of his agreement with Prima Products. It was then provided that in consideration of said cancellation and the "execution of the new agreement" between plaintiff and defendants, the latter agreed to pay plaintiff the specified royalty on all Aquella "sold" in the designated area, with such payment due "on the tenth of the month following the month in which

[the] merchandise [was] sold.'' It was further stipulated that defendants' ''obligation to pay royalties'' should ''last and continue *as long as* the term of [the] agreement between Prima Products . . . and [defendants], *or* until April 12th, 1969, and for an additional fifteen years'' if defendants were ''not in default with Prima Products . . .'' Then followed defendants' agreement ''not to do anything which [would] jeopardize rights of [defendants] under [the] agreement to be entered into with Prima Products . . .''

Summarizing this royalty agreement, it is apparent that defendants undertook to pay a royalty on Aquella *sold* in their territory so long as they held their distributorship under the agreement with Prima Products, and agreed further ''not to do anything that [would] jeopardize'' their rights under that ''distribution'' agreement. From such quoted provision in the royalty agreement, can it be said that a breach thereof arose by reason of defendants' failure to purchase or order the minimum quota, even though they could not with reasonable diligence sell such quota? The word ''jeopardize'' means ''to endanger'' or ''to imperil'' (Webster's New Internat. Dict., 2d ed.; Words and Phrases, perm. ed., vol. 23), and, of course, defendants' failure to make the minimum purchase from Prima Products expressly rendered their distributorship agreement subject to cancellation. From this premise plaintiff argues that since he could not be paid a royalty on Aquella sold unless it was first purchased from Prima Products by defendants for sale in their territory, it was essential to the integrity of the royalty agreement that defendants continue to purchase the specified minimum yearly quantity of Aquella and keep the ''distribution'' agreement in good standing. However, under their agreement with Prima Products, the inescapable fact still remains that defendants plainly had no obligation to purchase the minimum quota of Aquella; they had the ''right'' to decline to do so without penalty other than potential loss of their exclusive distributorship. Although their obligation was to use reasonable diligence, their ''rights'' included the right to decline to purchase more Aquella than they could, using such diligence, sell in their territory.

To adopt plaintiff's construction of the word ''jeopardize'' would mean that defendants would be unconditionally bound to purchase 20 per cent of Prima Products' output until 1969 and 15 years thereafter, no matter how slow the market might be in their territory. Thus, every year for such prolonged

period defendants, in order not to "jeopardize [their] rights," would have to purchase Aquella that they could not sell, and regardless of the fact that such continued purchases would add nothing to plaintiff's income, since his royalties were based only on Aquella sold. Moreover, such construction of the particular clause in question would run counter to the import of other language in the royalty agreement—the "intention" expressed in the preamble that plaintiff should receive a royalty "as long as" Aquella was sold through defendants, and the provision that the obligation to pay royalties should continue "as long as" the term of the distribution agreement with Prima Products, *or* until April 12, 1969, and for an additional 15 years if defendants were "not in default"—language expressly recognizing the possibility that defendants' distributorship might be cancelled before 1969 and that plaintiff's royalty rights would end upon any such termination by cancellation.

■ The language of the royalty agreement must be construed as a whole and in relation to the simultaneously executed master contract in order to give effect to every part thereof (Civ. Code, § 1641; *Burnett* v. *Piercy,* 149 Cal. 178, 189 [86 P. 603]), and particular words or clauses must be subordinated to general intent (Civ. Code, § 1650; *Lynch* v. *Keystone Con. Min. Co.,* 163 Cal. 690, 698 [126 P. 968]; *Moore* v. *Wood,* 26 Cal.2d 621, 630 [160 P.2d 772]). ■ As so construed, it appears that defendants' duties under the royalty agreement were coextensive with their duties under their distribution agreement. In line with these observations, the only reasonable interpretation of the "jeopardize" clause is that by it defendants were bound to use reasonable diligence and good faith in performing under their distributorship contract; but that they were not bound, at whatever cost to themselves, to purchase Aquella that they could not sell in the exercise of such diligence, in order to preserve plaintiff's alleged rights. As above indicated, there is nothing in the extrinsic evidence introduced by plaintiff which will sustain the contrary interpretation which was adopted by the trial court. It thus follows that the pivotal point in settlement of the parties' dispute is whether defendants did exercise reasonable diligence in their selling efforts and nevertheless were unable to meet the minimum purchase quota as set forth in their distribution agreement with Prima Products. This issue was not tried before the trial court, and in the absence of a showing of bad faith or lack of reasonable diligence on the

part of defendants, there is no basis for plaintiff's recovery of damages against defendants in reliance upon the terms of the royalty agreement.

The judgment is reversed.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.