[Sac. No. 7822.   In Bank.   Nov. 13, 1968.]

DELTA DYNAMICS, INC., Plaintiff and Respondent, v. EDWIN ARIOTO et al., Defendants and Appellants.

Charles A. Zeller and Francis X. Vieira for Defendants and Appellants.

Maxwell M. Freeman and Roger H. Bernhardt for Plaintiff and Respondent.

TRAYNOR, C. J.—Plaintiff Delta Dynamics, Inc. developed a trigger lock for use as a safety device on firearms. On March 23, 1961, it entered into a contract with defendants, partners doing business as the Pixey Distributing Co., for the distribution and sale of the locks throughout the United States. The contract was to run for five years from the date of the first delivery of the locks, and Pixey was given an option to renew the contract for another five years. Delta agreed to manufacture or arrange for the manufacture of the locks and to supply them to Pixey, which it appointed as exclusive distributor. Pixey agreed to pay for the locks at specified prices. Pixey promised to promote the locks diligently and "to sell not less than 50,000 units within one year from the date of delivery of the initial order" and not less than 100,000 units in each of the succeeding four years. "Should Pixey fail to

distribute in any one year the minimum number of devices to be distributed by it . . . this agreement shall be subject to termination'' by Delta on 30 days' notice. The contract also provided that ''In the event of breach of this agreement by either party, the party prevailing in any action for damages or enforcement of the terms of this Agreement shall be entitled to reasonable attorneys' fees.''

Pixey ordered and paid for 10,000 locks, and Delta delivered them in August 1961. In October 1961 Pixey executed a written purchase order requesting Delta to supply 10,000 additional locks to be delivered ''as needed.'' Pixey never requested delivery of that order, however, and it did not order any of the 30,000 additional locks needed to meet the 50,000 quota for the first year. On October 1, 1962, Delta terminated the agreement. Thereafter it brought this action to recover damages for Pixey's failure to purchase the first year's quota.

After a nonjury trial the court entered judgment for Delta. It interpreted the contract as requiring Pixey to purchase 50,000 locks in the first year, which commenced with the initial delivery of 10,000 locks, and rejected Pixey's defense that Delta's exclusive remedy for Pixey's failure to meet the quota was the right to terminate the contract. Pixey appeals.

■ We note at the outset that there is no merit in Pixey's contention that it did not agree to buy 50,000 locks from Delta in the first year, but only to sell that number to third parties. Since Pixey agreed to buy the locks from Delta, the only source of supply, its promise to sell 50,000 locks to third parties clearly implied a promise to buy that number from Delta, and the trial court correctly so found.

■ Pixey contends, however, that the termination clause made Delta's right to terminate the contract Delta's exclusive remedy for Pixey's failure to meet the annual quota and that the trial court erred in refusing to admit extrinsic evidence offered to prove that the termination clause had that meaning.[1]

[1]The pretrial conference order stated that one of the issues to be decided was whether ''the option given . . . to the Plaintiff to terminate the distributorship for failure to sell 50,000 locks within one year [is] the exclusive remedy of the Plaintiff for said failure.'' At the trial counsel for defendants called one of his clients and asked, ''During the negotiations that culminated in the execution of this contract between your company and Delta Dynamics, was there any conversation or discussion as to what would happen as far as Pixey Distributing Company is concerned if they failed to meet the minimum quota set up in that contract?'' Plaintiff's counsel objected that the question called for parol evidence. Defendants' counsel answered that ''The contract is ambiguous

■ "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." ■ To determine whether offered evidence is relevant to prove such a meaning the court must consider all credible evidence offered to prove the intention of the parties. "If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, 'is fairly susceptible of either one of the two interpretations contended for . . .' [citations], extrinsic evidence to prove either of such meanings is admissible." (*Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) *ante,* pp. 33, 40 [69 Cal.Rptr. 561, 442 P.2d 641].)

■ In the present case the parties may have included the termination clause to spell out with specificity the condition on which Delta would be excused from further performance under the contract, or to set forth the exclusive remedy for a failure to meet the quota in any year, or for both such purposes. That clause is therefore reasonably susceptible of the meaning contended for by Pixey, namely, that it expresses the parties' determination that Delta's sole remedy for Pixey's failure to meet a quota was to terminate the contract. There is nothing in the rest of the contract to preclude that interpretation. It does not render meaningless the provision for the recovery of attorneys' fees in the event of an action for damages for breach of the contract, for the attorneys' fees provision would still have full effect with respect to other breaches of the contract.[2] Accordingly, the trial court com-

---

and we are trying to elicit from the testimony of various witnesses what the intentions of the parties were." The objection was sustained. The offer of proof, taken alone, was too general to provide a ground for appeal. (*Stickel* v. *San Diego Elec. Ry. Co.* (1948) 32 Cal.2d 157, 162-164 [195 P.2d 416]; *Douillard* v. *Woodd* (1942) 20 Cal.2d 665, 670 [128 P.2d 6]; see Evid. Code, § 354, subd. (a).) In the context of this trial, however, where, as the pretrial conference order demonstrates, one of the primary issues was whether the contract permitted recovery of damages for the failure to meet a quota, it was obvious that counsel expected his witness to answer that the parties intended termination to be an exclusive remedy. Thus the substance, purpose, and relevance of the offered evidence was made known to the court, and no more complete offer of proof was required. (*People* v. *McGee* (1947) 31 Cal.2d 229, 242 [187 P.2d 706]; *People* v. *Duane* (1942) 21 Cal.2d 71, 81 [130 P.2d 123]; see Evid. Code, § 354, subd. (a).)

[2] For example, Pixey might have breached the contract by failing diligently to promote the locks or by not paying for locks that had been delivered. Delta might also have breached the contract in various ways.

mitted prejudicial error by excluding extrinsic evidence offered to prove the meaning of the termination clause contended for by Pixey. The judgment must therefore be reversed.

■ Invoking *Newby* v. *Anderson* (1950) 36 Cal.2d 463 [224 P.2d 673], Pixey contends that for the guidance of the trial court on retrial we should hold that in the absence of extrinsic evidence offered to prove a different meaning of the contract, termination is Delta's sole remedy for Pixey's failure to meet a quota. In the *Newby* case the national distributor of a product called "Aquella" had appointed Newby its western distributor. The national distributor was not satisfied with Newby's performance and transferred the distributorship to the Andersons. To effectuate the transfer, the Andersons signed a distributorship agreement with the national distributor and a royalty agreement with Newby. The distributorship agreement provided that " 'in order to retain exclusive distribution "The Andersons" must purchase 400,000 gallons of Aquella per annum' " and that " 'It is agreed that "The Andersons" shall diligently . . . prosecute the sale of Aquella throughout the entire territory, and do all things reasonably necessary to establish the sale of Aquella in all trade centers. . . .' " (*Newby* v. *Anderson, supra,* 36 Cal.2d 463, 465.) Later the national distributor terminated the Andersons' western distributorship because the Andersons did not sell the quota, and Newby brought an action against the Andersons under the royalty agreement. We held that the national distributor's sole remedy for the Andersons' failure to meet the quota was to terminate the agreement. The Andersons had only promised, however, diligently to prosecute the sale of Aquella, and had undertaken "no obligation to purchase the minimum quota of Aquella." (*Newby* v. *Anderson, supra,* 36 Cal.2d 463, 469.) Likewise, they had undertaken no obligation to sell the minimum quota to third parties. Under those circumstances, the purchase of 400,000 gallons was only a condition for retaining the distributorship. That condition did not embody a promise for the breach of which an action for damages would lie. In the present case, however, as noted above, Pixey promised to buy the stated quotas from Delta. Normally the breach of such a promise would give rise to an action for damages. Although the termination clause is reasonably susceptible of a meaning that precludes that remedy in the absence of extrinsic evidence, we believe it should not be given that meaning but

should be interpreted only as a statement of the condition on which Delta could terminate the contract.

The judgment is reversed.

Peters, J. ,Tobriner, J., and Sullivan, J., concurred.

MOSK, J.—I dissent.

Both on the basis of the four corners of the contract and the context in which the interrogation proceeded, the trial court properly excluded parol evidence.

Defendant's counsel, in direct examination of his own witness, asked: "All right now, Mr. Hoffman. *During the negotiations* that culminated in the execution of this contract between your company and Delta Dynamics, was there any conversation or discussion as to what would happen as far as Pixey Distributing Company is concerned if they failed to meet the minimum quota set up in that contract?" (Italics added.)

An objection was made by plaintiff's counsel and sustained by the court. Defense counsel neither made an offer of proof nor any further effort to demonstrate there was an ambiguity in the contract, or if there was, to offer an explanation.

On that frail record of a fleeting and demonstrably improper single question, the majority reverse a judgment to which the trier of fact found plaintiff clearly entitled on the weight of the evidence.

It is hornbook law that conversations, discussions and *negotiations* culminating in a written instrument are not admissible in evidence. Indeed, since 1872 Civil Code section 1625 (amended in 1905), has provided that the "execution of a contract in writing, whether the law requires it to be written or not, *supersedes all the negotiations* or stipulations concerning its matter which preceded or accompanied the execution of the instrument." (Italics added.)

Whether or not defendant's counsel intended to limit his query to negotiations preceding execution of the contract, the unalterable fact is that he did so. He asked no further questions and made no offer of proof. His efforts on this appeal, and those of the majority of this court, to expand his inquiry beyond the subject of negotiations are an attempt to rewrite the record.

The majority hold that an offer of proof was unnecessary because the pretrial conference demonstrated "counsel expected his witness to answer that the parties intended termination

to be an exclusive remedy." This is pure legal legerdemain, for while the purpose of the pretrial proceeding is to determine the issues to be tried (Van Alstyne & Grossman, California Pretrial and Settlement Supplement (Cont. Ed. Bar 1967) § 3.30), it has always been understood that "the parties' contentions on those issues are generally regarded as merely tentative, nonbinding descriptions of what the parties hope to prove" (*id.*, § 10.14). No authority holds or has hinted that a pretrial discussion or order is a substitute for an offer of proof at the trial.

As stated in *Ransom* v. *Ransom* (1963) 215 Cal.App.2d 258, 264 [30 Cal.Rptr. 53] : "It is a recognized rule that: 'Ordinarily when the ruling of the court sustaining an objection indicates that counsel may not make further inquiry of a similar nature, he must then make an offer of proof. For example, if an objection is sustained to a question which on its face does not indicate its materiality, counsel asking the question must show the materiality of the question and the expected answer. If counsel fails to make the required offer of proof, he is precluded from urging the exclusionary ruling as error on appeal. [Citation.] The requirement of the offer of proof serves two practical purposes. First, it permits the trial court to reconsider and correct an erroneous exclusionary ruling in the light of all the facts. Second, it permits the appellate court to determine if the ruling was erroneous and, if so, whether it was sufficiently prejudicial to justify a reversal of the judgment.' (California Civil Procedure During Trial (Cont.Ed. Bar 1960) § 13.26.) "

Not only did counsel fail to make an offer of proof, his query was obviously faulty. As Justice Gargano wrote for a unanimous Court of Appeal in this case (65 Cal.Rptr. 616, 622), " [I]t is evident from counsel's question that he was not attempting to lay a foundation to show a latent ambiguity, nor was he attempting to prove that the words used in the contract were used in some special or technical sense. To the contrary, counsel's question was seemingly an attempt to change, vary or add to the terms of the agreement. Hence the trial court properly sustained the objection."

Once again this court adopts a course leading toward emasculation of the parol evidence rule. During this very year *Masterson* v. *Sine* (1968) 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561], and *Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) *ante*, p. 33 [69 Cal.Rptr. 561, 442 P.2d 641], have contributed toward that result. Al-

though I had misgivings at the time, I must confess to joining the majority in both of those cases. Now, however, that the majority deem negotiations leading to execution of contracts admissible, the trend has become so unmistakably ominous that I must urge a halt.

It can be contended that there may be no evil per se in considering testimony about every discussion and conversation prior to and contemporaneous with the signing of a written instrument and that social utility may result in some circumstances. The problem, however, is that which devolves upon members of the bar who are commissioned by clients to prepare a written instrument able to withstand future assaults. Given two experienced businessmen dealing at arm's length, both represented by competent counsel, it has become virtually impossible under recently evolving rules of evidence to draft a written contract that will produce predictable results in court. The written word, heretofore deemed immutable, is now at all times subject to alteration by self-serving recitals based upon fading memories of antecedent events. This, I submit, is a serious impediment to the certainty required in commercial transactions.

I would affirm the judgment.

McComb, J., and Burke, J., concurred.

Respondent's petition for a rehearing was denied December 11, 1968. McComb, J., Mosk, J., and Burke, J., were of the opinion that the petition should be granted.