[Civ. No. 1863. Fifth Dist. May 3, 1974.]

DAVIES MACHINERY CO., Plaintiff and Respondent, v.
PINE MOUNTAIN CLUB, INC., et al., Defendants and Appellants.

### COUNSEL

Raymond, Noriega, Clifford & Jenkins, Stephen Clifford, Robert E. Brimberry, Carter J. Stroud and Thomas Underhill for Defendants and Appellants.

Rex R. Mull for Plaintiff and Respondent.

### OPINION

**FRANSON, J.**—Prior to April 15, 1969, W. J. and Paul Smith ("the Smiths") had leased and purchased on a time basis various pieces of earthmoving equipment from the respondent, Davies Machinery Co. ("Davies"). They had dealt with each other off and on over a period of some 25 years.

On April 15, 1969, the parties entered into a security agreement for the purchase of 12 pieces of new equipment plus other equipment which had been previously purchased under various security agreements. On September 15 this contract was superseded by a new security agreement covering all the equipment purchased under the security agreement of April 15 as well as six new pieces of equipment. Under the September 15 agreement the total deferred payment price including finance charges was $1,045,776, payable in 24 monthly payments of $43,574, starting October 15, 1969. The contract provided that all payments not paid when due would accrue interest at the rate of 12 percent.

By July 1970 the Smiths had become delinquent in the contract payments and on the open account established for maintenance and repair of the equipment and owed Davies over $100,000. After the Smiths fell behind in payments, Marion Kelley, manager for Davies, met several times with Paul Smith and Frank Remerowski, the accountant for Smith in an attempt "to allow them to keep the equipment and to let them work [their] way out." On July 6 Paul Smith, Remerowski, Ernie Davies and Kelley and two others from Davies' met in Hanford. Remerowski testified that at the July 6 meeting he told Davies, "I saw no reason at all why if we should continue bidding on the jobs that we could get some of the jobs and . . . would probably start paying for these equipment again as per contract." He said, ". . . I think that Mr. Kelley then picked up the ball and said that probably we could ultimately pay it off . . . ."

At the July 6 meeting, the parties orally agreed that the Smiths would keep the equipment and would pay for it on the basis of a specified hourly rate for the actual number of hours each piece of equipment was used. Nothing was said about terminating the September 1969 purchase contract. The parties agreed that the open account for maintenance and repair would continue. At the close of the meeting Kelley dictated a memorandum concerning the terms of the oral agreement. This memorandum was not signed by the parties but they agreed, both at the meeting and at trial, that it accurately reflected the oral agreement.[1]

---

[1] The memorandum reads: "MEETING AT HANFORD, CALIFORNIA BETWEEN PAUL SMITH, FRANK REMEROWSKI, ERNIE DAVIES, JIM GODSEY, ROY LARIMER AND M. E. KELLEY

"The following was mutually agreed: W. J. Smith is to pay the Davies Machinery Co. Machine Rent on actual hours worked at the following rates—

| | |
|---|---|
| "D8 | $18.00 per hour |
| 621 | 20.00 per hour |
| 633 | 30.00 per hour |
| #14 Motor Grader | 8.00 per hour |

"A weekly report is to be furnished to the Davies Machinery Co. showing hours

Mr. Remerowski testified that he understood that the payments to Davies for the use of the equipment would be applied to amounts owing on the purchase contract.[2] After July 1970 Davies continued to send hand-written periodic statements to the Smiths showing the amount of the delinquency under the purchase contract with added principal and interest charges. After July 1970 the Smiths paid the 1970-71 personal property taxes on the equipment to the County of Kern. They also expended some $8,000 in safety modifications to the equipment.

In accordance with the July 1970 agreement, Remerowski submitted weekly reports to Davies showing the hourly use of the equipment on various jobs worked by the Smiths. Davies maintained a separate account for maintenance and repairs.

On February 2, 1971, the Smiths entered into a contract with appellant Pine Mountain Club, Inc. to do land-leveling work on land owned by it and known as the "Mel Potrero" project. Thereafter, the Smiths got behind in payments to Davies on both the open account and the hourly rate for the equipment. On June 24 Davies served on Pine Mountain Club, Inc., a preliminary 20-day notice under Civil Code section 3097. Progress payments owed by Pine Mountain Club, Inc. to the Smiths were sent to Davies subsequent to June 4, 1971, the lien date. Smiths continued working on the Mel Potrero project until about September 1, when they removed the equipment from the job and advised Davies that they could take the equipment back. On September 30 Davies recorded a mechanic's lien against the Pine Mountain Club, Inc. real property. On November 3 it initiated the instant action for the foreclosure of the lien for the period between June 24 and September 24, 1971, alleging that $56,911.55 was due under the lien. Thereafter, by agreement with the Smiths, Davies repossessed the equipment and sold it.

In its third finding of fact, the trial court found as follows: "Between

worked for all equipment on contract.

"From the first income based on the hourly rental, the Smiths open account is to be paid in full. After the open account is paid in full, it is to be paid the 10th of each and every month from income other than from these monthly rentals."

[2] The record shows the following testimony by Remerowski: "Q. Was there anything said concerning how the final figures on the hourly rates for the use of the equipment would be handled insofar as Davies Equipment books and records were concerned?

"A. It would apply onto the payments.

"THE COURT: Did Mr. Kelley say that?

"A. I said that.

"THE COURT: Oh, you said that. What did Mr. Kelley say about it?

"A. . . . I understood him to say that the use payments would apply on the regular contract."

June 4, 1971 and September 24, 1971, plaintiff furnished at the request of defendants W. J. SMITH and PAUL V. SMITH earthmoving equipment, and parts, labor, services and materials therefor, for the construction of roads, grading of land, and other improvements, in the reasonable market value of $48,873.80, which equipment, parts, labor, services and materials were used and furnished in making improvements on said real property described hereinabove. Said earth moving equipment, parts, labor, services and materials were furnished pursuant to a written memorandum of agreement (plaintiff's Exhibit 1 in evidence), orally agreed to between the parties and an open account carried in the name of W. J. Smith with plaintiff. *Said written memorandum of agreement by implication cancelled and terminated all prior written agreements between plaintiff and said defendants for the purchase, rental or leasing of the equipment described therein.*" (Italics added.) On May 9, 1972, Davies was awarded a judgment of $48,873.80 against the Smiths and Argonaut Insurance Company, who bonded them against the imposition of valid liens on the subject property, and the judgment charged a lien against the Pine Mountain Club, Inc. real property. On May 24 Pine Mountain Club, Inc. and Argonaut Insurance Company filed notices of motions for new trial and the motions were denied. Appellants filed a timely notice of appeal.

## DISCUSSION

In reviewing a trial court's interpretation of a written instrument where no conflicting extrinsic evidence is received, an appellate court is not bound by the trial court's ruling but must give the writing its own independent interpretation. (*Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825]; *Estate of Shannon,* 231 Cal.App.2d 886, 890 [42 Cal.Rptr. 278]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 257-260, pp. 4248-4251.) The rationale for this rule is stated rhetorically in *Estate of Shannon:* "[W]here only the interpretation of written instruments is concerned, unaffected by extrinsic evidence, is not an appellate court, after studying the briefs on appeal, listening to the arguments of counsel, and thereafter engaging in a full discussion of the problem among the justices, in a more adequately informed position than is the trial judge and therefore better able to interpret the intent of the parties? . . . We conclude that in any case where extrinsic evidence is completely lacking or the quantum and quality thereof does not in reason place the trial judge in a better position to form an accurate interpretation of writings, or in other words, where interpretation is essentially a question of law rather than of fact, an appellate court is not bound by the determination of the trial court." (231 Cal.App.2d at pp. 890-891.)

We believe that logic and reason also compel our making an independent determination of the meaning to be given to an oral agreement where, as in the case at hand, the parties have agreed that a written memorandum, although unsigned, accurately reflects the oral agreement and where the extrinsic evidence, though subject to conflicting inferences, presents no factual conflicts giving rise to questions of credibility. (*Estate of Dodge,* 6 Cal.3d 311, 318, fn. 4 [98 Cal.Rptr. 801, 491 P.2d 385]; *Parsons* v. *Bristol Development Co., supra,* 62 Cal.2d 861, 866.)

The judgment ordering foreclosure of the lien can be upheld only if Davies was a *lessor* of the subject equipment at the time it was used by the Smiths on the Mel Potrero project. Civil Code section 3110 provides that "Mechanics, materialmen, contractors, subcontractors, *lessors of equipment . . .* and all persons . . . furnishing materials or leasing equipment to be used or consumed in, or furnishing appliances, teams, or power contributing to a work of improvement shall have a lien upon the property . . . ." [Italics added.][3] Vendors who have only a security interest in the equipment used by contractors or subcontractors on the property are not included within the class of persons entitled to a mechanic's lien. (Civ. Code, § 3110; see *Roebling's S. Co.* v. *Humboldt etc. Co.,* 112 Cal. 288, 291-292 [44 P. 568]; *Blakemore Equip. Co.* v. *Braddock, Logan & Valley,* 269 Cal.App.2d 12, 16 [74 Cal.Rptr. 484]; *Tarter, Webster & Johnson, Inc.* v. *Windsor Developers, Inc.,* 217 Cal.App.2d Supp. 875, 878-879 [31 Cal.Rptr. 452]; cf. *Theisen* v. *County of Los Angeles,* 54 Cal.2d 170, 177 [5 Cal.Rptr. 161, 352 P.2d 529]; *George F. Kennedy, Inc.* v. *Miles & Sons Constr. Division,* 5 Cal.App.3d 516 [85 Cal.Rptr. 298].) Not being the beneficial owner of the equipment, a vendor has no standing to claim a lien for the value of the use of the equipment.

The trial court's finding that the oral agreement "by implication" cancelled and terminated all prior written agreements between the parties was an apparent finding of a *novation.* A novation is a substitution by agreement of a new obligation for an existing one with the intent to extinguish the latter. (Civ. Code, §§ 1530-1532; Cal. U. Com. Code, § 2209; *Klepper* v. *Hoover,* 21 Cal.App.3d 460, 463 [98 Cal.Rptr. 482]; *Amerson* v. *Christman,* 261 Cal.App.2d 811, 826 [68 Cal.Rptr. 378]; *Eluschuk* v. *Chemical Engineers Termite Control, Inc.,* 246 Cal.App.2d 463, 468 [54 Cal.Rptr. 711]; 1 Witkin, Summary of Cal. Law (1960) Contracts, §§ 314-315, pp. 339-341.) The burden of proof is on the party

---

[3]California law is contrary to the majority view in the United States. In most states a mechanic's lien may not be based upon the rental of machinery and tools unless the items are consumed in the improvement. (See 3 A.L.R.3d 573, 578-589.)

asserting that a novation has been consummated (*Hunt* v. *Smyth,* 25 Cal. App.3d 807, 818 [101 Cal.Rptr. 4]) and the intention of the parties to extinguish the prior obligation and to substitute a new agreement in its place must "clearly appear." (*Goodman* v. *Citizens Life & Cas. Ins. Co.,* 253 Cal.App.2d 807, 816 [61 Cal.Rptr. 682]; *Hunt* v. *Smyth, supra,* at p. 818; see also *Eluschuk* v. *Chemical Engineers Termite Control, Inc., supra,* at p. 468; *Ayoob* v. *Ayoob,* 74 Cal.App.2d 236, 250 [168 P.2d 462].)

A modification or alteration, unlike a novation, does not terminate the pre-existing contract. "An executed oral modification of a term of provision of [a] contract does not wholly extinguish the contract; the effect is to alter only those portions of the written contract directly affected by the oral agreement leaving the remaining portions intact." (Civ. Code, § 1698; *Eluschuk* v. *Chemical Engineers Termite Control, Inc., supra,* at p. 469.)

Neither in the written memorandum nor the other evidence presented at trial do the parties expressly state an intent to extinguish the purchase contract. They agreed only that the payments would be changed from the specified monthly amount to a time-use amount with the first payments to be made on the open account. While the memorandum is silent on the point, it is apparent from the subsequent conduct and testimony of the parties that it was intended that when the open account was paid up the payments were to be credited on the purchase price of the equipment. Remerowski, the Smiths' accountant, testified that the purpose of the July 6 meeting was to arrange lower monthly payments on the purchase contract so that the equipment could ultimately be paid off. Davies' manager, Kelley, testified as follows: "Q. Now, after July 6 of 1970, was that security agreement [of September 1969] that you are just looking at still in full force and effect?

"A. It had never been cancelled. We had never released our equity in the equipment, no.

"Q. Had the Smiths ever released their equity in the equipment to the Davies Machinery Co.?

"A. Not in writing, no. *No, there was never any release.*" (Italics added.) Remerowski also testified: "Q. What, if anything, was said insofar as payments pursuant to that contract were concerned?

"A. We detailed to Mr. Davies the probable jobs that we had bid on and the machinery that was out and the job that we were bidding on then and our premise was that we could work ourselves out of this. In other words, we could utilize all of the equipment.

"Q. And still continue on with the contracts?

"A. *Ultimately, yes.*" (Italics added.)

■ A new arrangement for payment under a contract is not, in itself, sufficient to effect a novation. (*San Gabriel Val. Ready-Mixt* v. *Casillas*, 142 Cal.App.2d 137, 140 [298 P.2d 76]; see also *Hunt* v. *Smyth, supra*, 25 Cal.App.3d 807, 819-820.)

■ Davies' standard lease form was not utilized in connection with the hourly use arrangement they had with the Smiths. Burton Davies, assistant manager to Kelley, testified that the company's standard rental agreement was on a *minimum* monthly basis and that hourly use rates without a fixed monthly minimum were unusual. He explained: "Ordinarily, our rental rates are based on so much per month, and not by the hour. Any time we let anybody rent anything there by the hour the rate is necessarily higher, because the privilege of putting zero hours on the machine for a month and paying us nothing and I would say that a reasonable monthly rental rate, for example, for a 633 tractor would be in the neighborhood of $6,000 a month . . . Now that would be a minimum whether the man ran 176 hours or nothing and he would pay out $6,000." The evidence also shows that after July 1970 the Smiths paid the 1970-71 Kern County personal property taxes (installments due December 1970 and April 1971). Under a bona fide lease arrangement, Davies, as owner of both the beneficial and legal title to the equipment, would have paid the personal property taxes due thereon. The Smiths also made extensive safety modifications on the equipment, a fact that strongly implies that the parties believed that the Smiths continued as the owners of the equipment.

Davies continued, after the 1970 agreement, to send periodic delinquency statements to the Smiths showing the added principal and interest charges under the purchase contract. The statements show that the added principal charges from August 25, 1970, through August 25, 1971, varied from about $43,500 per month to as low as $18,000 per month. From this a strong inference arises that after payment on the open account, the hourly use payments were credited to the purchase price of the equipment. ■ The conduct of the parties subsequent to the execution of a contract and before any controversy had arisen as to its effect, is persuasive evidence in determining the meaning of the agreement. "This rule of practical construction is predicated on the common sense concept that 'actions speak louder than words.' Words are frequently but an imperfect medium to convey thought and intention. When the parties to a contract perform under it and demonstrate by their conduct that they know what they were talking

about, *the courts should enforce that intent.*" (Italics added.) (*Crestview Cemetery Assn.* v. *Dieden,* 54 Cal.2d 744, 754 [8 Cal.Rptr. 427, 356 P.2d 171]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 527, pp. 449-450.)

Respondent contends that the use in the memorandum of the word "rent" to describe the hourly payments sufficiently implies an intent to create a lessor-lessee relationship. However, what the parties actually intended by the use of the word must be ascertained from the terms of the agreement interpreted in the light of the circumstances that existed in July 1970 and the subsequent conduct of the parties in performing the agreement. (See *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33, 38 [69 Cal.Rptr. 561, 442 P.2d 641]; *Delta Dynamics, Inc.* v. *Arioto,* 69 Cal.2d 525, 528 [72 Cal.Rptr. 785, 446 P.2d 785].) "Rent" is generally defined as payment made for the use of property. (Webster's New Internat. Dict. Unabridged (3d ed.); Black's Law Dictionary (4th ed. 1951).) ■ After independently evaluating the evidence and the conflicting inferences to be drawn therefrom, it is our opinion that the word "rent" was used merely to describe the payments to be made during the interim period until the Smiths could resume regular payments under the purchase contract and that the vendor-vendee relationship between Davies and the Smiths was not terminated by the oral agreement.

We deem it unnecessary to discuss appellants' other contentions as to the invalidity of respondent's mechanic's lien.

The judgment foreclosing a mechanic's lien in favor of Davies Machinery Co., a corporation, and against the land owned by Pine Mountain Club, Inc., a corporation, is reversed.

The judgment against Argonaut Insurance Company on the bond in the sum of $48,873.80, is reversed.

The judgment in favor of Davies Machinery Co., a corporation, and against W. J. Smith and Paul V. Smith, in the sum of $48,873.80, is affirmed.

Appellants Davies Machinery Co. and Argonaut Insurance Company are awarded their costs on appeal.

Brown (G. A.), P. J., and Gargano, J., concurred.

A petition for a rehearing was denied May 23, 1974.