[Civ. No. 43100. First Dist., Div. Four. Apr. 18, 1979.]

JOSEPH BLUMENFELD et al., Plaintiffs and Respondents, v.
R. H. MACY & CO., INC., et al., Defendants and Appellants.

COUNSEL

Garrett McEnerney II, John Knutson, Orrick, Herrington, Rowley & Sutcliffe, James R. Madison, Marie B. Riehle, Ronald Hayes Malone, Steven A. Brick, Pillsbury, Madison & Sutro, Walter R. Allan and Jerome C. Dougherty for Defendants and Appellants.

Lewis, Rouda & Lewis, Marvin E. Lewis and Lawrence J. Less for Plaintiffs and Respondents.

OPINION

**CHRISTIAN, J.**—Real Estate Investment Trust of America, Inc. (REITA) and R. H. Macy & Co., Inc. (Macy) appeal from a judgment in favor of Joseph Blumenfeld and the Sacramento Country Club Shopping Center, a partnership (collectively Blumenfeld).

Blumenfeld filed a complaint against Macy for $5 million general damages, alleging that Macy had breached an agreement to sublease space in Blumenfeld's shopping center. REITA was brought into the action later when Blumenfeld sought a judicial declaration of whether Blumenfeld had assigned to REITA any right of action which Blumenfeld may have had against Macy.

The cause for declaratory relief, and an affirmative defense pleaded by Macy based in part on the asserted assignment to REITA of Blumenfeld's claim against Macy, were severed from other issues and consolidated for a separate trial.

A bench trial resulted in a judgment for Blumenfeld. REITA and Macy appeal.

Blumenfeld is a family partnership that developed the Sacramento Country Club Shopping Center. In 1961, Blumenfeld sold the shopping center to REITA, taking back a lease of the realty and all improvements.

In August 1968, Blumenfeld and Macy entered into negotiations for Macy to sublease part of the shopping center. REITA was involved in these negotiations and loaned construction funds to Blumenfeld for improvement of the center to Macy's specifications in connection with the proposed sublease. Macy ultimately terminated the negotiations without taking a sublease.

Blumenfeld's financial stability was threatened by Macy's decision not to enter the shopping center. Blumenfeld therefore began negotiations for the sale of Blumenfeld's leasehold interest in the shopping center to REITA. Negotiations continued for four or five months, culminating in the "Agreement for Purchase and Sale of Country Club Shopping Center" which is the subject of this litigation. Blumenfeld received a total of $1,477,552.56 for surrender of its leasehold interest in the shopping center: $325,000 in cash, and the cancellation of $1,152,552.56 in loans that Blumenfeld owed to REITA (the proceeds of which had been used to improve the shopping center to meet Macy's specifications).

The issues on appeal are whether Blumenfeld transferred its claims against Macy to REITA under the agreement, and whether extrinsic evidence is admissible to interpret the agreement. We conclude that the agreement did transfer the Macy claim from Blumenfeld to REITA, and that extrinsic evidence is not admissible to interpret the agreement.

The portions of the agreement between Blumenfeld and REITA relevant here are the third "Whereas" clause on page one of the agreement, clauses 4 (A), (E) and (H), and the addenda to the agreement introduced as plaintiff's exhibit 10-C, -G, and -H. All of these portions are reproduced below except for the lengthier exhibits 10-C and -H.

"*Whereas* REITA desires to purchase and Sacramento desires to sell Sacramento's entire interest in the Country Club Shopping Center (the 'Center'), including Sacramento's lessee's interest under the Master Lease, and Sacramento's lessor's interest under the leases and subleases of property at the Center made by Sacramento and its predecessors in interest;

"Now, Therefore, the parties hereto agree as follows: . . . .

"4. *Representations, Warranties and Agreements.*

"Sacramento represents, warrants and agrees as follows:

"(A) Except as otherwise set forth in the Assignments, the Assignments include all of Sacramento's right, title and interest in and to all assets and property related to the Center, whether tangible or intangible, including, without limitation on the generality of the foregoing, all lessor's interests in and rights to rent under subleases, leases, tenancies and rights of possession or occupancy affecting the Center, all other agreements relating to the Center, all items of real or personal property located in, on or customarily a part of the Center or used or useful for the operation or maintenance thereof by Sacramento, Blumenfeld Enterprises or their agents or employees, and all claims against third parties (including loans) relating to the Center.

"(E) REITA may deal with any third party with regard to the Center on such terms and conditions as it may see fit without liability to Sacramento, despite the fact that Sacramento may have dealt with such third party with regard to the Center. Without limitation on the generality of the foregoing, REITA may negotiate and contract with Macy's with regard to the location of a Macy's store at the Center on the same or on different terms as may have been discussed between Sacramento and Macy's.

"(H) To the best of Sacramento's knowledge and belief, there are no lawsuits pending with regard to the Center or claims which might give rise to such, other than those listed in Exhibit E hereto."

The "Exhibit E" referred to in clause 4(H) (plaintiffs' exhibit 10-G) provides in its entirety:

*"Law Suits and Claims*

"1. Suit by Foreman & Clark against Sacramento."

In the trial court, Blumenfeld sought to establish the following through extrinsic evidence. (1) The agreement conveyed Blumenfeld's entire interest pertaining or related to the shopping center. Blumenfeld intended the adjectival phrases "related to the center," "with regard to the center," and similar language in the agreement to mean "related to tenants currently in the center." Because Macy was never a tenant, the agreement assertedly did not convey any claim related to Macy. (2) The agreement conveyed all of Blumenfeld's claims against third parties relating to the center. Blumenfeld intended the phrase "third parties" to mean "tenants currently in the shopping center." (3) Blumenfeld considered the Macy claim to be a personal claim, not one related to the shopping center. (4) Blumenfeld intended to sell only the physical assets and the leases pertaining to the center.

The trial court concluded that the contract was unclear concerning the transfer to REITA; and received extrinsic evidence to determine the parties' intentions regarding the Macy claim. The extrinsic evidence of the negotiations that culminated in the agreement establishes: John Blumenfeld had decided to sue Macy before signing the agreement with REITA. Blumenfeld told George Howland, a trustee of REITA and its representative in the Blumenfeld-REITA negotiations, that Blumenfeld intended to sue Macy. Blumenfeld did not intend, and did not express any intention, to transfer the Macy claim to REITA. REITA intended to purchase all of Blumenfeld's claims against third parties generally. REITA did not intend to purchase the Macy claim specifically. Howland knew there had been problems between Blumenfeld and Macy, but he did not have the Macy claim in mind in negotiating the agreement for REITA. He considered the Macy claim worthless and never thought Blumenfeld would actually bring suit against Macy. REITA itself had no intention of suing Macy. Although clause 4(E) of the agreement expressly reserved to REITA the right to

renegotiate a lease with Macy, neither Blumenfeld's counsel, Robert Sills, nor REITA's trustee, Howland, considered that a Blumenfeld suit against Macy would interfere with REITA-Macy negotiations. REITA's attorney, John Hartman, was generally responsible for drafting the agreement. Hartman asked Blumenfeld's counsel, Sills, to prepare an exhaustive list of assets that would be included in the transfer. Sills declined and suggested that a list of all assets that would be *excluded* from the transfer be prepared instead. Allan Blumenfeld, a member of the partnership, prepared a partial list of included assets and a list of excluded assets. The Macy claim is not specified in either list.

The trial court admitted the extrinsic evidence, and found that the language of the contract was ambiguous concerning the transfer to REITA; that Blumenfeld did not intend, and never expressed any intention to REITA or to anyone any intention, to transfer the claim against Macy to REITA; and that REITA did not intend, and never expressed to Blumenfeld or to anyone any intention, to purchase the claim against Macy from Blumenfeld. The trial court concluded that REITA and Blumenfeld shared responsibility for the ambiguity concerning the Macy claim, and that REITA had no right, title, or interest in Blumenfeld's claim against Macy.

The trial court's interpretation of the agreement is not binding on an appellate court, and the Court of Appeal must make its own independent interpretation if, as here, the interpretation does not turn on the credibility of extrinsic evidence and does not require a resolution of a conflict in that evidence. (See generally *Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 259-260, pp. 4249-4251.)

The agreement contains an integration clause. The parol evidence rule generally prohibits the introduction of any extrinsic evidence to vary or add to the terms of an integrated written instrument. (Civ. Code, § 1625; Code Civ. Proc., § 1856; Rest. Contracts, § 237.) Through interpretations by the California Supreme Court, this rule has "been reduced to a shambles in this state." (*Buehler* v. *Oregon Washington Plywood Corp.* (1976) 17 Cal.3d 520, 530 [131 Cal.Rptr. 394, 551 P.2d 1226] [Mosk, J. dis.]. See generally *In re Marriage of Dawley* (1976) 17 Cal.3d 342, 353, fn. 7 [131 Cal.Rptr. 3, 551 P.2d 323]; *Estate of Cohen* (1971) 4 Cal.3d 41, 54 [92 Cal.Rptr. 684, 480 P.2d 300]; *Tahoe National Bank* v. *Phillips* (1971) 4 Cal.3d 11 [92 Cal.Rptr. 704, 480 P.2d 320]; *Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versicherunges A.G.*

(1970) 3 Cal.3d 434, 443 [91 Cal.Rptr. 6, 476 P.2d 406]; *Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525 [72 Cal.Rptr. 785, 446 P.2d 785]; *Estate of Russell* (1968) 69 Cal.2d 200, 205-213 [70 Cal.Rptr. 561, 444 P.2d 353]; *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Masterson* v. *Sine* (1968) 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561].)

"The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably ssusceptible." (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,supra,* 69 Cal.2d at p. 37.)

The *Pacific Gas & E. Co.* decision requires a court to follow a two-step process to determine the admissibility of extrinsic evidence to interpret a written agreement (69 Cal.2d 33, 40). First, so that the court can place itself in the same situation in which the parties found themselves at the time they entered the agreement, the court should provisionally receive, without actually admitting, all credible evidence concerning the intention of the parties to determine whether or not the written agreement is reasonably susceptible to the interpretation offered by a party. Second, if the court decides in light of this extrinsic evidence that the contract is reasonably susceptible to the offered interpretation, then the court may admit such extrinsic evidence to interpret the contract. On the other hand, if the court decides in light of this entrinsic evidence that the contract is not reasonably susceptible to the offered interpretation, then the evidence is irrelevant and inadmissible to interpret the contract. (See *Tahoe National Bank* v. *Phillips, supra,* 4 Cal.3d 11, 23; *In re Marriage of Dawley, supra,* 17 Cal.3d 342, 353, fn. 7; *Estate of Cohen, supra,* 4 Cal.3d 41, 54.) " 'If the evidence offered would not persuade a reasonable man that the instrument meant anything other than the ordinary meaning of its words, it is useless.' " (*Estate of Russell, supra,* 69 Cal.2d 200, 211 quoting *Estate of Rule* (1944) 25 Cal.2d 1, 22 [152 P.2d 1003, 155 A.L.R. 1319] [Traynor, J. dis.], disapproved on · other grounds in *Parsons* v. *Bristol Development Co., supra,* 2 Cal.2d 861, 866, fn. 2.)

Applying these standards to the instant case, under the first part of the *Pacific Gas & E. Co.* analysis the trial court properly received on a provisional basis the extrinsic evidence offered to show whether or not Blumenfeld intended to assign the Macy claim to REITA. In *Delta Dynamics, Inc.* v. *Arioto, supra,* 69 Cal.2d 525, for example, the California

Supreme Court, applying the *Pacific Gas & E. Co.* standard, held that the trial court committed prejudicial error by excluding extrinsic evidence of prior conversations, discussions, and negotiations culminating in a written agreement to interpret the terms of the writing.

However, the extrinsic evidence in the present case is not admissible under the second part of the *Pacific Gas & E. Co.* analysis. The terms of the written contract here are not reasonably susceptible to the interpretations offered by Blumenfeld. Clause 4(A) of the agreement explicitly assigned to REITA "all assets and property related to the Center, whether tangible or intangible, including . . . all other agreements relating to the Center . . . and all claims against third parties relating to the Center." The all-inclusive language of the agreement is not reasonably susceptible of the meaning advanced by Blumenfeld. The single reference to Macy, in clause 4(E), is not reasonably susceptible of any interpretation that Blumenfeld, despite the all-inclusive conveyance of clause 4(A), withheld a cause of action against Macy.

The extrinsic evidence was therefore not admissible to show that Blumenfeld did not intend to assign the Macy claim to REITA, contrary to clause 4(A). Although the trial court admitted it, the evidence will not support the judgment because it is irrelevant. (*Tahoe National Bank* v. *Phillips, supra,* 4 Cal.3d 11, 16-17, 23; see Jefferson, Cal. Evidence Benchbook (1972) § 32.3, p. 577.)

Blumenfeld was simply mistaken in its belief that it had retained the Macy claim. ■ Under the objective test of contract formation, a "meeting of the minds" is unnecessary. A party is bound, even if he misunderstood the terms of a contract and actually had a different, undisclosed intention. (*Brant* v. *California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 [48 P.2d 13]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, §§ 244, 522, pp. 212-213, 445-446.)

The judgment is reversed with directions to render judgment dismissing the action.

Caldecott, P. J., and Rattigan, J., concurred.

A petition for a rehearing was denied May 18, 1979, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied July 12, 1979. Mosk, J., did not participate therein.